In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3728

Thomas Amadio,

Plaintiff-Appellant,

v.

Ford Motor Company,

Defendant-Appellee.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 7810--George W. Lindberg, Judge.


Argued September 6, 2000--Decided February 1, 2001


        Before Cudahy, Coffey, and Ripple, Circuit Judges.

        Cudahy, Circuit Judge.  Thomas Amadio was an
hourly employee on the assembly line at Ford
Motor Company's Chicago Assembly Plant from June
9, 1986, to March 8, 1995, the date of his
termination by Ford Motor Company (Ford). In the
three years prior to his termination, Amadio
suffered from a variety of ailments that led him
to take a total of approximately 70 weeks of sick
leave. Because Amadio allegedly failed to fully
comply with Ford's sick leave policy, Ford
terminated Amadio's employment. Following his
termination, Amadio filed this suit against Ford
under the Americans with Disabilities Act (ADA),
42 U.S.C. sec.sec. 12101-12213, claiming that
Ford discriminated against him because of his
disability or, in the alternative, because it
regarded him as having a disability. The district
court granted summary judgment in favor of Ford.
We affirm.

I.   BACKGROUND
A.   Facts

        In reviewing a grant of summary judgment, we
set forth the facts in a light most favorable to
the non-moving party (here, Amadio), drawing all
reasonable inferences in its favor. See Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

1.

Amadio started at Ford's assembly plant on June 9, 1986, working, as he would until his termination, on the assembly line. Amadio began his career as an assembler, but later graduated to the general utility position in the chassis division, a position that qualified Amadio to be assigned to any duty on the assembly line involving the production of the car chassis.

Amadio was a member of the International Union of the United Automobile Workers of America (UAW), Local 551, as well as of the international union. The UAW was the certified collective bargaining representative for all hourly employees at the assembly plant, and a collective bargaining agreement (CBA) between Ford and the UAW governed the terms and conditions of Amadio's employment.

The CBA specifically provides for employee sick or medical leaves. A medical leave under the CBA is requested from, and granted by, the medical staff employed at the assembly plant. Generally, Ford's medical staff does not conduct an independent examination of the employee, but instead decides the propriety of a medical leave based solely upon documents submitted by the employee in support of the request. Ford Form 5166, "Medical Leave Authorization for Hourly Employees," is generally used by employees in submitting a required physician's statement and an anticipated return to work date.

Under the CBA, an employee who does not report to work after the expiration of his medical leave is mailed what is known as a "five-day quit" letter. This letter requires the employee to report to work or, if unable to do so, to report to the company medical section, or mail in a form completed by the employee's doctor or phone the assembly plant with an expected return date. If an employee fails to respond adequately to a five-day quit letter, the employee may be terminated.

2.

Amadio appears to have gained an intimate familiarity with the CBA's sick leave provisions in the last three years of his employment. Indeed, the record indicates that Amadio took 23 medical leaves, and was absent for no less than 70 weeks during this time period. In addition, Amadio was also subject to several disciplinary lay-offs during this time period, apparently for failure to adequately comply with Ford's sick leave procedures.

During Amadio's last three years of employment

with Ford, he suffered from several ailments, including illnesses (such as an upper respiratory infection, a cold and similar afflictions), an occupational back injury, hepatitis B, Brown's Syndrome,/1 high blood pressure, a liver disorder and a urinary tract infection. While Amadio's liver disorder and urinary tract infection were apparently the result of his hepatitis, the remaining ailments appear to have been unrelated to one another.

Amadio's ailments resulted in several extended absences from work. For example, Amadio was on continuous medical leave from May 9, 1994 to October 28, 1994. Amadio was again on leave from November 2, 1994 to November 21, 1994. And, of most importance to this case, Amadio was once again on leave from December 2, 1994 to the date of his termination on March 8, 1995.

Amadio's last extended absence from work began with the diagnosis of Brown's Syndrome in November 1994. While being treated for Brown's Syndrome, Amadio was diagnosed with hepatitis B. Shortly thereafter, he was further diagnosed with liver disease and a urinary tract infection. In order to tend to this last round of ailments, Amadio properly secured a medical leave, which he began on December 2, 1994. This leave expired on February 26, 1995. Because Amadio had still not returned to work on February 28, 1995, Louis Lafayette, a human resource representative in the labor relations department at the assembly plant, mailed a five-day quit letter (February 28 Letter) to Amadio. This letter required Amadio to respond on or before March 7, 1995, by reporting either to work or to the assembly plant's medical section for an evaluation. The letter further required Amadio to bring "satisfactory medical evidence" covering his entire period of absence.

On March 6, Amadio chose to report to the medical section, where he discussed his medical status with a clerk and a nurse. During his visit, Amadio provided Ford's medical staff with a Ford Form 5166, documenting his absence from February 27, 1995, to March 6, 1995, but failing to document his absence prior to February 27, 1995, as requested by the February 28 Letter. Amadio indicated that he had an upcoming appointment with a specialist regarding his urinary tract infection and that he would bring additional medical leave paperwork after this appointment. Amadio alleges that Ford's medical personnel responded by telling him "no problem, when you get your information from the specialist come back and see us."

3.

Lafayette terminated Amadio's employment on March 8, 1995, allegedly because Amadio failed to adequately document his entire medical leave when he visited the assembly plant's medical section on March 6, as required by his February 28 Letter. Consistent with assembly plant custom, Lafayette sent a memorandum to assembly plant personnel, informing them of Amadio's termination and instructing them that Amadio was to be referred to the assembly plant's labor relations department before going to work or having further contact with assembly plant medical personnel.

Later in the day on March 8, and subsequent to Lafayette's termination of Amadio, Richard Jordan, another human resources representative at the assembly plant, mailed a second five-day quit letter (March 8 Letter) to Amadio. This letter indicated that Amadio's medical leave expired on March 5, and not on February 26, as stated in the February 28 Letter. The March 8 Letter gave Amadio until March 15 to return to work./2

Amadio attempted to return to the assembly plant medical section on March 9, 1995. He had seen a medical specialist and was hoping to submit a Ford Form 5166 that indicated an expected return to work date of March 17, 1995. However, upon Amadio's arrival at the medical section, the medical personnel refused to accept Amadio's new Ford Form 5166. Instead, as instructed by Lafayette's memorandum, they referred Amadio to the assembly plant labor relations department, which informed Amadio of his termination.

Following an unsuccessful appeal of his discharge through the CBA's grievance procedure, Amadio filed this action against Ford. In this action, Amadio alleges for the first time that Ford discriminated against him in violation of the ADA because Ford knew that he had a disability or regarded him as having a disability.

B.   District Court Proceedings

The district court issued a one-page order granting summary judgment in favor of Ford, finding that Amadio was not a "qualified individual with a disability" under the ADA. The district court expressed doubt that Amadio had a "disability" as defined by the ADA because it believed that Amadio's medical conditions were temporary. The district court also determined that Amadio was unable to perform all of the essential functions of his job because he was unable to come to work on a regular basis. He had missed approximately 70 weeks of work during the

preceding three years. In addition, the court found that Ford was not required to continue granting medical leaves as a reasonable accommodation of Amadio's inability to appear for work. Accordingly, the court held that Amadio was unable to prove a prima facie case of disability discrimination under the ADA. Lastly, the court stated that, even if Amadio had been able to establish a prima facie case under the ADA, Ford had articulated a legitimate, nondiscriminatory reason for Amadio's termination--that Amadio failed to adequately document his absence as required by the February 28 Letter.

II.  DISCUSSION
A.  Standard of Review

We review de novo the district court's disposition of this case on summary judgment. See Cengr v. Fusibound Piping Sys., Inc., 135 F.3d 445, 450 (7th Cir. 1998). In so doing, we bear in mind that summary judgment is only proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). We, of course, view the record in a light most favorable to the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

B.  ADA Claim

The ADA states that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees . . . ." 42 U.S.C. sec. 12112(a). When, as here, there is no direct evidence of discrimination, a plaintiff must instead attempt to prove a prima facie case under the familiar scheme of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See DeLuca v. Winer Indus., 53 F.3d 793, 797 (7th Cir. 1995).

A prima facie case under the ADA is established when a plaintiff proves that: (1) he belongs to the protected group; (2) he performed his job satisfactorily; (3) he was subjected to an adverse employment action; and (4) similarly situated employees received more favorable treatment. See DeLuca, 53 F.3d at 797. If the plaintiff fails to prove any of these elements, his claim fails. See id. However, if the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the

defendant's employment action. See id. If the defendant clears this hurdle, the burden once again shifts to the plaintiff to show that the defendant's offered reason is merely pretextual. See id.

Here, there is no need to reach the later inquiries of the McDonnell Douglas analysis because Amadio has failed to prove even the first element of a prima facie case--that he is a member of the protected group. For the purpose of showing that he is a member of the ADA's protected group, a plaintiff must establish that he is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. sec. 12111(8). Stated another way, to prove membership in the ADA's protected class, a plaintiff must establish up to three elements: (1) a disability; (2) the ability to perform the essential functions of the employment position; and (3) if unable to perform the essential functions without accommodation, the existence of a reasonable accommodation that would allow performance of the position's essential functions. Amadio fails to establish even one of these three elements, and he thus fails to prove any part of the first requirement of a prima facie ADA claim.

1.

We first address Amadio's claim that he has a "disability" as that term is employed by the ADA. The ADA defines "disability" to include: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. sec. 12102(2); see also 29 C.F.R. sec. 1630.2(g). Amadio concedes that he does not meet the first two definitions of a disability but vigorously contends that he satisfies the third definition--that Ford regarded him as having an impairment that substantially limits one or more of his major life activities.

The purpose of the "regarded as" definition of a "disability" is to "cover individuals 'rejected from a job because of the 'myths, fears and stereotypes' associated with disabilities.'" Sutton v. United Airlines, Inc., 527 U.S. 471, 489-90 (1999) (quoting 29 C.F.R. pt. 1630, App. sec. 1630.2(l)). An individual may prove a "regarded as" claim by showing that either "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life

activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Sutton, 527 U.S. at 489; see also 29 C.F.R. sec. 1630.2(l).

It is important to note that, in order to establish a "regarded as" claim, it is not enough for a plaintiff to show that the employer knew of the plaintiff's impairment. See Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 510 (7th Cir. 1998). The plaintiff must also show that the employer believed that one or more of the plaintiff's major life activities were substantially limited by the plaintiff's impairment. See id.; see also 29 C.F.R. sec. 1630.2(l). Such major life activities include, for example, "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Sinkler v. Midwest Prop. Mgmt. Ltd. Partnership, 209 F.3d 678, 683-84 (7th Cir. 2000) (citing 29 C.F.R. sec. 1630.2(i)). The plaintiff must select the major life activities that he will attempt to prove the employer regarded as being substantially limited by his impairment. See Bragdon v. Abbott, 524 U.S. 624, 637-38 (1998); Sinkler, 209 F.3d at 683.

In this case, Amadio has alleged that Ford regarded his hepatitis as limiting only his major life activity of working. However, before we can decide whether Ford regarded Amadio's hepatitis as limiting his ability to work, we must first take a detour to decide what facts may inform our analysis of Amadio's "regarded as" claim. Perhaps the best evidence that exists to support Amadio's claim resides in the affidavit that he submitted in response to Ford's motion for summary judgment. In his affidavit, Amadio alleged that in February 1995 he told Lafayette, "I'm blind in one eye, I just learned that I have hepatitis B so come on, give me a break and quit riding me about the medical leaves." Amadio further alleged that Lafayette replied by saying that he had "heard hepatitis B was contagious and maybe [Amadio] should not come around the Plant."

Amadio's affidavit statements directly contradict the testimony he gave at an earlier deposition, during which he was asked, "Was there any point in time when you told a Ford employee, a management person, that you were handicapped or disabled?" To this question, Amadio simply responded, "No." Further, at his deposition Amadio was asked at length about conversations he had with Lafayette, and not once did Amadio disclose the conversation he alleged in his affidavit. He even answered in the negative after being asked, "Just for the sake of completeness

can you remember at all any other difficult conversations with Lou Lafayette other than anything you've testified to so far?"

Amadio responds to the contradictions in his testimony by arguing that Ford should have asked more specific questions at his deposition. It is, however, difficult to imagine how Ford could have been more specific. At the very least, being told that one's ailment is contagious and that one is no longer welcome around the plant certainly seems to qualify as a "difficult conversation." Amadio should have mentioned it as such during his deposition, especially given his detailed recollection of other conversations with Lafayette. For example, Amadio was asked the following questions during his deposition:

Then I believe you said that Lou Lafayette gave you a hard time and said things along the lines of you need to show up to work; is that a fair characterization of your testimony? [affirmative response omitted] . . . Can you tell me as specifically as you can exactly what he said in that regard?

In response, Amadio remembered that sometime between January 27, 1995 and February 3, 1995, Lafayette told him "to get your ass back to work or you're going to get your ass fired."

It is by now well-settled that a party may not attempt to survive a motion for summary judgment by manufacturing a factual dispute through the submission of an affidavit that contradicts prior deposition testimony. Consequently, "[w]here a deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." Russell v. Acme-Evans Co., 51 F.3d 64, 67-68 (7th Cir. 1995) (citing Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1297 (7th Cir. 1993)). As already noted, Amadio provided no acceptable explanation for his failure to describe Lafayette's alleged statements during his deposition. As such, because Amadio's affidavit directly contradicts his prior deposition testimony, the affidavit is inadmissible, and we will only consider Amadio's deposition testimony. See Piscione v. Ernst & Young, L.L.P., 171 F.3d 527, 532-33 (7th Cir. 1999); Slowiak, 987 F.2d at 1295.

Amadio rightly points out that Lafayette's testimony is seemingly contradictory as well. In Lafayette's affidavit in support of Ford's motion for summary judgment, Lafayette maintained that,

at the time of his decision to terminate Amadio he did not know that Amadio had been suffering from blindness in his left eye, had hepatitis or had any other infection. On the other hand, Lafayette testified at his deposition that he was of the "opinion" that he was aware of Amadio's medical information prior to terminating Amadio. Just as a non-moving party may not use a contradictory affidavit to manufacture a factual dispute for the purpose of surviving summary judgment, a moving party may not rely on a contradictory affidavit to negate the existence of a factual dispute for the purpose of winning summary judgment. As a result, and because we view the record in a light most favorable to Amadio, we assume that Lafayette was aware of Amadio's hepatitis at the time Lafayette terminated Amadio's employment.

Thus, after excluding the contradictory affidavits, and viewing the remaining facts in the light most favorable to Amadio, we are left with the following facts against which to examine Amadio's claim that Ford regarded him as disabled: (1) Amadio never told a Ford employee that he was handicapped or disabled; (2) Amadio never had a difficult conversation concerning his hepatitis with Lafayette; and (3) Lafayette knew of Amadio's hepatitis before he terminated Amadio's employment.

On these facts, no reasonable jury could find that Ford regarded Amadio as having a disability that substantially impaired his ability to work. There is no evidence that Amadio ever discussed the reasons for his medical leaves with the labor relations department at the assembly plant, or with Lafayette in particular. Even though we assume, for purposes of reviewing a grant of summary judgment, that Lafayette did know of Amadio's hepatitis at the time Lafayette terminated Amadio's employment, this knowledge is insufficient, in itself, to show that Lafayette regarded Amadio as substantially limited in the life activity of working. To divine from the known facts the conclusion that Lafayette terminated Amadio's employment out of a fear of Amadio's hepatitis would require us not to draw a reasonable inference in Amadio's favor, as we are required to do in reviewing an order of summary judgment, but to engage in speculation. It is well-settled that speculation may not be used to manufacture a genuine issue of fact. See Gorbitz v. Corvilla, Inc., 196 F.3d 879, 882 (7th Cir. 1999); Patterson v. Chicago Assoc. for Retarded Citizens, 150 F.3d 719, 724 (7th Cir. 1998). Accordingly, Amadio has failed to show that Ford regarded him as being disabled.

2.

Even if Amadio had been able to prove that Ford regarded him as having a disability, Amadio would still need to establish that, with or without reasonable accommodation, he could perform the essential functions of his employment position. See Deane v. Pocono Med. Ctr., 142 F.3d 138, 140 (3d Cir. 1998); see also 42 U.S.C. sec. 12111(8); 29 C.F.R. sec. 1630.2(m).

We first recognized work attendance as an essential requirement of employment in Vande Zande v. Wis. Dep't of Admin., 44 F.3d 538, 544 (7th Cir. 1995) (attendance required of clerical worker position). Since Vande Zande, the list of occupations in Seventh Circuit cases requiring attendance as an essential function has grown to include, in addition to clerical worker, the positions of teacher, Nowak v. St. Rita High Sch., 142 F.3d 999 (7th Cir. 1998), account representative, Corder v. Lucent Tech., Inc., 162 F.3d 924 (7th Cir. 1998), production employee, Waggoner v. Olin Corp., 169 F.3d 481 (7th Cir. 1999), and plant equipment repairman, Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co., 201 F.3d 894 (7th Cir. 2000). While we will not say that attendance is an essential function of every employment position, Amadio's position on the assembly line at Ford's assembly plant can easily be added to the "attendance required" list. Indeed, the requirement that an employee be in attendance is "especially true in factory positions . . . where the work must be done on the employer's premises; maintenance and production functions cannot be performed if the employee is not at work." Jovanovic, 201 F.3d at 900.

It is clear that Amadio's record of attendance does not meet even the minimum requirements of his position. Amadio took 23 medical leaves during his last three years of employment (totaling approximately eighteen months of absence) and was disciplined several times in connection with his absenteeism. We have consistently found that plaintiffs who have attendance records similar to or substantially better than Amadio's do not qualify for protection under the ADA. See Jovanovic, 201 F.3d at 900 (employee missing twenty-four days in past twelve months not qualified); Waggoner, 169 F.3d at 485 (employee missing 5 months of work, and showing up late or not at all for forty days in a fourteen-month period, not qualified); Corder, 162 F.3d at 928 (employee missing eighteen months of work not qualified); Nowak, 142 F.3d at 1003-04 (employee missing eighteen months of work not qualified). Similarly, Amadio's lengthy absences from a job that requires regular attendance lead us to conclude that Amadio could not perform all essential functions of his employment position.

3.

When a disabled employee cannot perform the essential functions of a job, the court must consider whether any reasonable accommodation by the employer would help the employee to perform those functions. See Cochrum v. Old Ben Coal Co., 102 F.3d 908, 911 (7th Cir. 1996); see also 42 U.S.C. sec. 12112(b)(5)(A). The ADA states that "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. sec. 12111(9)(B). However, if an accommodation "would impose an undue hardship" on the operation of the employer's business, the accommodation need not be made. 42 U.S.C. sec. 12112(b)(5)(A). The facts relevant to a determination of whether a medical leave is a reasonable accommodation are the facts available to the decision-maker at the time of the employment decision. See Bay v. Cassens Transp. Co., 212 F.3d 969, 974 (7th Cir. 2000); Nowak, 142 F.3d at 1003.

When an employee is unable to perform the essential function of attending his employment, few, if any, reasonable accommodations exist. In fact, if an employee cannot regularly attend work, the only imaginable accommodation is an open-ended schedule that allows the employee to come and go as he pleases. This is especially true of employees like Amadio who seemingly take advantage of a company's apparently generous leave policy to show up for only a few days at a time between absences that occasionally stretch over several months. We are thus led here to the same conclusion we reached in Jovanovic: "We would be hard-pressed to imagine a manufacturing facility that could operate effectively when its employees are essentially permitted to set their own work hours, and we thus reject such a schedule as an unreasonable accommodation under the circumstances of this case." 201 F.3d at 899 n.9.

Amadio attempts to distinguish his case by arguing that his poor attendance record is not indicative of his ability to work at the time he was fired. Amadio maintains that he eventually would have been able to work had Ford reasonably accommodated him with the one week of additional medical leave he requested as necessary to return to full health. Amadio bases this argument on his appearance at the assembly plant medical section

on March 9, 1995, the day after he was terminated, with a doctor's note giving his expected date of return to work as March 17, 1995.

Undoubtedly, a short, one-week medical leave constitutes a reasonable accommodation in many circumstances. Here, however, we have already determined that Amadio is unable to regularly attend his job. Thus, in order to claim that a continued absence from his job would have been a reasonable accommodation, Amadio must do more than merely allege that he would have been able to return to work on a full-time basis if only he had been given one more week of leave. In Amadio's case, Ford had every reason to believe that giving Amadio additional leave would be an ineffectual gesture. Amadio's record of attendance clearly indicated that, even if he had returned to work in one week, he was not likely to remain for very long before a new ailment afflicted him. Amadio took 23 medical leaves, and was absent for more than 70 weeks during the last three years of his employment. In addition, during his employment at Ford, Amadio was disciplined on several occasions for absenteeism, including a 30-day layoff for insufficient documentation of a medical leave, a one-week layoff relating to a previous medical leave, and a number of three-day and one-day layoffs. In light of these facts, the extension of Amadio's already lengthy leave by one more week would have been a futile concession, not a reasonable accommodation./3 Indeed, while we have not considered this fact in rendering our decision, we note that Ford's suspicions were ultimately realized; in spite of Amadio's contention that he merely needed one week before being able to return to work, he did not in fact find a new job until over one year had elapsed because his hepatitis remained actively symptomatic.

Amadio makes one last attempt to show that an extended leave would have been a reasonable accommodation by arguing that Ford was bound by its obligations under the CBA, which explicitly provided for medical leaves. However, the fact that Ford generously granted extended leaves to its employees--in rare cases, up to two years-- does not necessarily bind Ford to repeatedly grant successive leaves to Amadio, especially since Amadio had a history of abusing his medical leave status. Usually, an employee on medical leave will be absent for a determinate period of time. In such a circumstance, an employer can hire temporary help or otherwise plan to compensate for the employee's absence on the production line. However, with a chronically absent employee like Amadio, the employer never knows when the employee's medical leave will

really terminate since the employee is likely to request yet another leave shortly after returning to work following the previous leave. This pattern of behavior prevents the employer from ever being able to adequately compensate for the missing employee's frequent, yet unpredictable absences.

While an employer should show patience when an employee first falls sick, if an employer "bends over backwards to accommodate a disabled worker . . . it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation." Vande Zande, 44 F.3d at 545; see also Duckett v. Dunlop Tire Corp., 120 F.3d 1222, 1225 (11th Cir. 1997) (An employer is not necessarily required to apply its own established business policy as a reasonable accommodation.); Myers v. Hose, 50 F.3d 278, 284 (4th Cir. 1994) ("A particular accommodation is not necessarily reasonable, and thus federally mandated, simply because the [employer] elects to establish it as a matter of policy."). As noted, Ford was more than generous when it granted Amadio the numerous and extended leaves he has received; Ford was under no duty to continue to do so indefinitely, given that Amadio showed no promise of ever committing himself to his work.

III.  CONCLUSION

Because Amadio fails to establish even the first element of a prima facie case under the ADA, we need not address the parties' dispute regarding the validity of Ford's stated reason for releasing Amadio. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."). For the foregoing reasons, the district court's entry of summary judgment in favor of Ford Motor Company is Affirmed.


/1 Brown's Syndrome is an inflammation of the muscle tissue that controls the eye. In Amadio's case, this disease led to blindness in Amadio's left eye lasting from November 1994 through January 1995.

/2 The parties dispute the meaning of this second five-day quit letter. Amadio maintains that this second letter proves that his medical leave had been extended until at least March 5 and that, therefore, Lafayette had prematurely terminated Amadio because of his disability. Amadio further supports his argument by alleging that Lafayette told him to stay away from the assembly plant

because Lafayette understood hepatitis to be contagious. On the other hand, Ford ascribes no meaning to the March 8 Letter, arguing that the letter was an oversight. The dispute is immaterial, however, because it is relevant only to a determination of Ford's motive for terminating Amadio. We need not consider Ford's motive because we find that Amadio was not a "qualified individual with a disability" under the ADA. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

/3 In addition, we observe that Amadio would lose on his reasonable accommodation claim at a trial. "An employee has the initial duty to inform the employer of a disability before ADA liability may be triggered for failure to provide accommodations--a duty dictated by common sense lest a disabled employee keep his disability a secret and sue later for failure to accommodate." Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1134 (7th Cir. 1996). As determined above, there is no admissible evidence that Ford knew of Amadio's alleged disability, or even regarded him as having one, at the time he was fired. Accordingly, Ford cannot be held liable for failing to accommodate Amadio.

Amadio would also likely lose on his reasonable accommodation claim because he did not make his request for a reasonable accommodation until after he was terminated. As announced in Webster v. Methodist Occupational Health Ctrs., Inc., "[a]n employee cannot refuse reasonable accommodations during the interactive process the [ADA] contemplates, and then after dismissal suggest something different and claim that the employer still has a duty to consider further accommodations," 141 F.3d 1236, 1238 (7th Cir. 1998). Similarly, an employee cannot wait until after dismissal to inform an employer of his disability and request an accommodation for the first time, as Amadio attempted to do here.