# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 05-1654

MARK HAGUE, CYNTHIA HAGUE, MARK BROWN, *et al.*,

*Plaintiffs-Appellants*,

*v.*

THOMPSON DISTRIBUTION COMPANY, d/b/a MUTUAL PIPE
AND SUPPLY COMPANY, MUTUAL PIPE AND SUPPLY
COMPANY, and JOHN T. THOMPSON,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 02 C 1744—**Richard L. Young**, *Judge.*

_____

ARGUED SEPTEMBER 20, 2005—DECIDED FEBRUARY 7, 2006

_____

Before EASTERBROOK, MANION, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* Thompson Distribution's owner, John Thompson, who is black, fired five white employees. Those employees, Mark Hague, Cynthia Hague, Mark Brown, Bernard Dubois, and Anna Perrey, then sued Thompson Distribution Co., alleging race discrimination in violation of 42 U.S.C. § 1981. The district court granted

Thompson Distribution summary judgment. The plaintiffs appeal and we affirm.

### I.

On November 26, 2001, John Thompson, who is black, purchased at a public sale the assets of Mutual Pipe & Supply Company, Inc., after Mutual Pipe defaulted on a bank loan. Prior to purchasing Mutual Pipe, Thompson had met with its Vice President and General Manager, Mark Hague. Hague had worked for Mutual Pipe for thirty-two years and his grandfather had started the business. Unfortunately for the Hague family, one of its major customers went bankrupt, and Mutual Pipe never recovered from the substantial financial hit it took as a result of its customer's bankruptcy. After several years of losing money, and finally defaulting on a bank loan, it became clear that Mutual Pipe could not remain in business.

Although Thompson originally considered buying Mutual Pipe, he realized that the asking price was significantly greater than its value and decided instead to wait until the company went into bankruptcy or the bank auctioned off its assets. In anticipation of the pending sale, Thompson established Thompson Distribution Company. If and when the bank auctioned off Mutual Pipe's assets, Thompson Distribution would attempt to acquire the assets. If successful, it would begin operations as a distributing company, distributing plumbing supplies and equipment to industrial, construction, and institutional firms.

In the months leading up to the public auction, Thompson met with Mark Hague several times to discuss Mutual Pipe's operations. Thompson also expressed interest in hiring Mark Hague and other Mutual Pipe employees, and he asked Mark Hague to make a list of the Mutual Pipe

employees whom he should hire. On November 27, 2001, the day after he was the successful bidder for the assets of Mutual Pipe, Thompson met with all of the Mutual Pipe employees who had expressed an interest in continuing to work for Thompson Distribution, including those employees Hague had recommended.

Thompson Distribution eventually decided to hire about fourteen employees, of whom about twelve (the record is unclear on the exact number) had previously worked for Mutual Pipe. Thompson Distribution then began operations on November 28, 2001. Among those hired were plaintiffs Mark Hague and his wife, Cynthia Hague,[1] Mark Brown, Bernard Dubois, and Anna Perrey, all of whom were white. Thompson Distribution also hired Mary Coleman and Bob McClellan, both of whom were white, along with John's wife, Norma Thompson, David Bigsby, Jimmy Ford, and Dwayne Springfield, all of whom were black. The following week Thompson Distribution hired another black employee. Including Thompson himself, this made up Thompson Distribution's initial labor force.

These employees were all hired on an at-will basis. Additionally, in hiring the plaintiffs, Thompson Distribution provided the plaintiffs with an "Employee Handbook," which stated: "A ninety-day trial period is provided for new employees to evaluate the opportunities of continued service with the company and, likewise, for the company to evaluate the new employee for continued service with the company." Before the ninety-day period expired, Thompson

---

[1] Thompson Distribution originally employed Cynthia Hague on a contract basis, but on January 11, 2001, hired her as a full-time employee.

Distribution fired the five plaintiffs.[2] Thompson Distribution fired Mark and Cynthia Hague on February 15, 2002. According to Mark Hague, in firing him, Thompson merely told him that his services were no longer needed in the future of Thompson Distribution. Similarly, Cynthia testified in her deposition that in firing her, Thompson simply said that she did not fit in the future of Thompson Distribution. Thompson Distribution fired Brown, Dubois, and Perrey on February 22, 2001, telling Brown and Perrey they did not fit in the company, and informing Dubois that Thompson Distribution is "moving ahead without you." Thompson Distribution replaced Mark Hague, Brown, and Perrey with three new employees, all of whom were black. Thompson's wife Norma (who is also black) took over Cynthia Hague's duties. Thompson Distribution did not replace Dubois.

After they were fired, the Hagues, Brown, Dubois and Perrey sued Thompson Distribution for race, age, and disability discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.,[3] 42 U.S.C. § 1981, the

---

[2] The plaintiffs maintain that Thompson Distribution never told them that their employment was on a 90-day probationary period. The Handbook, however, clearly provides for an initial trial period. Moreover, upon hiring the plaintiffs, Thompson Distribution provided letters to the plaintiffs which referenced the trial period, noting that health benefits would begin following the ninety-day trial period. Thus, the plaintiffs were on notice that Thompson Distribution considered them probationary employees for the initial ninety days. In any event, the plaintiffs were at-will employees.

[3] The plaintiffs later dropped their Title VII claims, proceeding instead under § 1981, because Thompson Distribution did not have the requisite fifteen or more employees to fall under the
(continued...)

Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq., and the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq., and state law, and for interfering with their ability to attain health benefits in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. The plaintiffs also sued Thompson, individually, for tortious interference with their contractual relationship with Thompson Distribution. The district court granted the defendants summary judgment on all counts. As to the § 1981 claims—the only claims challenged on appeal—the district court concluded either that the plaintiffs failed to establish that they were meeting Thompson Distribution's business expectations, or that they failed to present sufficient evidence of pretext. The plaintiffs appeal.

## II.

The district court granted Thompson Distribution summary judgment on the plaintiffs' § 1981 race discrimination claims. This court reviews the grant of summary judgment de novo, viewing the evidence in the light most favorable to the non-moving party. *Amadio v. Ford Motor Co.*, 238 F.3d 919, 924 (7th Cir. 2001).

On appeal, the plaintiffs initially argue that the district court improperly disregarded evidence they presented in opposing summary judgment and did not consider the evidence in the light most favorable to their claims. To support this assertion, the plaintiffs point to a footnote in the district court's opinion in which the district court scolded the plaintiffs for including a "17 page narrative which is full of immaterial facts and citations to affidavit paragraphs which contain speculation, opinion, hearsay and

---

[3] (...continued)
auspices of federal discrimination law. *See* 42 U.S.C. § 2000e(b).

conclusory statements." District Court Opinion at 3, n.2. The district court also reprimanded the plaintiffs for offering up factual "spin" and for "failing to specify what material facts are truly in dispute . . . ." *Id.* The plaintiffs maintain that this footnote shows that the district court seemingly adopted Thompson Distribution's factual assertions as though they had gone unrebutted. However, in their brief, the appellants do not identify any specific evidence the district court disregarded. In any event, since our review is de novo, whether the district court improperly ignored the plaintiffs' proffered evidence is irrelevant now. *See Smith v. Cook County*, 74 F.3d 829, 834 (7th Cir. 1996) ("Since we have conducted a *de novo* review of the motion for summary judgment we need not tarry long over these objections.").

Moving on to the merits: To succeed on a race discrimination claim under § 1981, plaintiffs may proceed under either the direct or indirect method. *Dandy v. United Parcel Serv. Inc.*, 388 F.3d 263, 272 (7th Cir. 2004). Here, the plaintiffs did not present direct or circumstantial evidence of discrimination. Instead they rely on the *McDonnell Douglas* indirect burden-shifting method. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This requires plaintiffs to first present evidence to establish a prima facie case of discrimination, namely: that they are members of a protected class; that they were meeting Thompson Distribution's business expectations; that they were fired; and that they were replaced by someone outside the protected class. *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1035 (7th Cir. 1999).

This framing of the prima facie case makes the first element—that the plaintiffs are members of a protected class—in essence a non-issue, because everyone has a race (or sex, or national origin). *See Steinhauer v. DeGolier*, 359 F.3d 481, 484 (7th Cir. 2004). However, in setting forth the prima facie case in several reverse discrimination suits, *i.e.*,

cases brought by a white plaintiff or a man, this court has required the white/male plaintiffs to "show 'background circumstances' sufficient to demonstrate that the particular employer has 'reason or inclination to discriminate invidiously against whites' [or men] or evidence that 'there is something "fishy" about the facts at hand.' " *See Ineichen v. Ameritech*, 410 F.3d 956, 959 (7th Cir. 2005) (quoting *Phelan v. City of Chicago*, 347 F.3d 679, 684 (7th Cir. 2003)). *See also Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 457 (7th Cir. 1999); *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005).

At first blush, it might seem that this line of cases altered the "member of the protected class" element of the prima facie case for white/male plaintiffs. However, that is not the case. Rather, this court adopted the background circumstances standard because in setting forth the indirect method in *McDonnell Douglas*, the Supreme Court stated that a prima facie case of racial discrimination required the plaintiff to show, "(i) that he belongs to a *racial minority*; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainants' qualifications." 411 U.S. at 802 (emphasis added). Thus, as this court recognized in *Hill v. Burrell Com. Group, Inc.*, 67 F.3d 665, 668 (7th Cir. 1995), overruled on other grounds, *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (1996), "applying the *McDonnell Douglas* standard literally in reverse discrimination cases such as this would prevent any plaintiff from making out a prima facie case."

However, "[i]t is well settled law that the protections of Title VII are not limited to members of historically

discriminated-against groups." *Ballance*, 424 F.3d at 617. Moreover, the Supreme Court made clear in *McDonnell Douglas* that the prima facie case is not inflexible and as "[t]he facts necessarily will vary in Title VII cases, . . . and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect in differing factual situations." *McDonnell Douglas,* 411 U.S. at 802, n.13. Accordingly, in *Mills* this court held that in a reverse-discrimination case the formulation of the first element, *i.e.,* that "he belongs to a racial minority" as set forth in *McDonnell Douglas,* needed modification. *Mills*, 171 F.3d at 456. As noted above, the modified standard, adopted by this and other circuits, requires a white/male plaintiff to establish " 'background circumstances sufficient to demonstrate that the particular employer has 'reason or inclination to discriminate invidiously against whites' or evidence that 'there is something "fishy" about the facts at hand.' " *Ineichen*, 410 F.3d at 959; *see also Mills*, 171 F.3d at 456; *see also Ballance*, 424 F.3d at 617. *See, e.g., Woods v. Perry*, 375 F.3d 671, 673 (8th Cir. 2004); (noting that "[i]n reverse discrimination cases the plaintiff has also been expected to show that 'background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority.'") (quoting *Duffy v. Wolle*, 123 F.3d 1026, 1036 (8th Cir. 1997)); *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) (accord); *Notari v. Denver Water Dep't*, 971 F.2d 585, 589 (10th Cir. 1992) (accord) ; *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985) (accord). *But see*, *Iadimarco v. Runyon*, 190 F.3d 151, 159-63 (3d Cir. 1999) (rejecting the "background circumstances" standard, reasoning that it impermissibly imposes a heightened standard on white/male plaintiffs, and holding that in a reverse discrimination case, the plaintiff must merely "present sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favor-

ably than others based upon a trait that is protected under Title VII"). [4] These same principles apply in the context of a § 1981 action. *See Bennett v. Roberts,* 295 F.3d 687, 697 (7th Cir. 2002) ("The same standards governing liability under Title VII apply to § 1981 claims.") (internal citation omitted). Therefore, because the plaintiffs are white, we must initially consider whether they satisfied the modified standard of proof.

In this case, the plaintiffs, all of whom are white, presented evidence that their black boss fired them and replaced three of them with black employees, the fourth plaintiff's job was assumed by a black employee, and the fifth was not replaced. These facts are sufficient to satisfy the modified *McDonnell Douglas* test, applicable to reverse discrimination cases. That is because, although the plaintiffs in this case are white, the background circumstances show that this case is no different than the more typical discrimination case. Typical discrimination cases often see members of a racial minority challenging their non-minority employer's decision to fire them and hire white replacements. Analogously, here we have a black employer terminating white employees and hiring black replacement workers. These circumstances create the same inference of discrimination flowing from the more straightforward discrimination cases. [5] *Cf. Preston,* 397 F.3d at 542 (explain

---

[4]   The plaintiffs do not seek reconsideration of the *Phelan/Mills* line of cases that established this modified standard in reverse discrimination, in light of *Iadimarco v. Runyon,* 190 F.3d 151 (3d Cir. 1999).

[5]   In cases involving white decision-makers favoring minorities over whites, other background circumstances may satisfy the plaintiffs' prima facie case. For instance, evidence that those
(continued...)

ing "[i]t is not surprising when women discriminate in favor of women any more than it is surprising when men discriminate in favor of men"). Therefore, under these circumstances, we conclude that sufficient "background circumstances" exist to allow the white plaintiffs to satisfy the modified first prong of the prima facie case.

Nonetheless, Thompson Distribution argues that it is entitled to summary judgment because the plaintiffs did not present sufficient evidence to satisfy the second prong of the prima facie case—that they were meeting Thompson Distribution's business expectations. Alternatively, Thompson Distribution argues that even if the plaintiffs established a prima facie case, it is still entitled to summary judgment because it produced evidence of legitimate, non-discriminatory reasons for firing the plaintiffs and the plaintiffs did not present any evidence of pretext. For each plaintiff, Thompson Distribution points to evidence to support its view that the plaintiffs did not meet its business expectation, or, alternatively, that Thompson Distribution fired them for legitimate, non-discriminatory reasons. Because Thompson Distribution's rationale differs with each plaintiff, we will consider them separately below.

---

[5] (...continued)
"running the company are under pressure from affirmative action plans, customers, public opinion, the EEOC, a judicial decree, or corporate superiors imbued with belief in 'diversity' to increase the proportion of [minorities] in the company's workforce," would satisfy the modified *McDonnell Douglas* standard. *Preston v. Wis. Health Fund*, 397 F.3d 539, 542 (7th Cir. 2005). *See, e.g., id.,* (explaining that in a case involving a male discriminating against another male in favor of a woman, such facts would provide the necessary background circumstances).

Before continuing, however, we pause to first discuss the appropriate analysis for this case. Here, the employer maintains that the plaintiffs were not qualified for the position (the second prong of the prima facie case) and that it fired the plaintiffs for a legitimate non-discriminatory reason. The plaintiffs respond by arguing that the employer is lying about both its business expectations and about the proffered reasons for their termination. Normally a court should first determine if a plaintiff has established a prima facie case before subjecting the employer to the pretext inquiry. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 327 (7th Cir. 2002) (quoting *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1178 (7th Cir. 1997) ("[I]f a plaintiff fails to demonstrate that he was meeting his employer's legitimate employment expectations, the employer may not be 'put to the burden of stating the reasons for his termination.' ")). However, if the plaintiffs argue that they have performed satisfactorily and the employer is lying about the business expectations required for the position, the second prong and the pretext question seemingly merge because the issue is the same—whether the employer is lying. *See Coco*, 128 F.3d at 1179 ("The defendant's expectations are not legitimate if they are phony; so if they are argued to be phony, the issue of legitimate expectations and the issue of pretext seem to merge.") The plaintiffs still must meet their burden. *Id.* However, when faced with this same situation in *Rummery v. Ill. Bell Tel. Co.*, 250 F.3d 553, 556 (7th Cir. 2001), we reasoned that "[b]ecause the issue of satisfactory job performance, which lies at the heart of this dispute, must be analyzed in detail at both stages of the *McDonnell Douglas* test, it is therefore simpler to run through that analysis only once." *See also Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886 (7th Cir. 2001). Accordingly, as in *Rummery*, we focus on the question of pretext, while keeping in mind that if the

plaintiffs did not present sufficient evidence of pretext, they also did not show that they were meeting their employer's expectations.

## A. Mark Brown

Mark Brown worked for Thompson Distribution as a warehouse manager. Thompson testified in his deposition that Thompson Distribution fired Brown for two main reasons: 1) Brown repeatedly cursed and yelled at his subordinates; and 2) Brown allowed a supplier to remove boilers from Thompson Distribution which Thompson believed belonged to him and not the supplier. This evidence satisfied Thompson Distribution's burden under *McDonnell Douglas* to produce evidence of a legitimate non-discriminatory reason for Brown's firing. *See Rand v. CH Indus., Inc.*, 42 F.3d 1139, 1145 (7th Cir. 1994) (explaining that an employer's mere production of a legitimate non-discriminatory reason for its action rebuts the presumption of discrimination created by the prima facie showing).

At this point, the burden shifts back to Brown to present sufficient evidence that Thompson Distribution's reason was pretextual. *Statler v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 289 (7th Cir. 1999). Pretext "means a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000). Thus, to show pretext, Brown must show more than that Thompson Distribution's "decision was 'mistaken, ill considered or foolish,' [and] so long as [the employer] honestly believes those reasons, pretext has not been shown." *Ballance*, 424 F.3d at 617 (quoting *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000)).

While arguing that Thompson Distribution's proffered reasons for his firing were pretextual, Brown admits that he used profanity at work, but he claims it was nothing more

severe than "hell" or "damn," and that he needed to yell and use this "shop talk" to motivate the individuals hired by Thompson Distribution, whom Brown claims were inexperienced and incompetent. As to allowing the supplier to remove the boiler, Thompson claims that he purchased all of the assets physically located at Mutual Pipe on November 26, 2001, including the boilers. Brown argues in response that the supplier owned the boilers and therefore he did nothing wrong. Specifically, Brown claims that prior to Thompson's purchase of Mutual Pipe's assets, Hague had arranged to return the boiler to the supplier for credit on its account, but that the supplier was unable to pick up the boiler prior to Thompson Distribution taking over. Brown thus maintains that the boiler belonged to the supplier and not Thompson Distribution.

In making these arguments, however, Brown does not comprehend his legal burden. Brown must establish that Thompson Distribution lied about its reasons for firing him—not that Thompson Distribution was wrong for firing him for the reasons it gave. *See Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) (explaining that our role is solely to assess whether the justifications given are honest, not whether the sanction imposed was accurate, wise or well considered). *See also Jordan*, 205 F.3d at 344 ("Discrimination laws serve only to prevent consideration of forbidden characteristics—like race—but they are not, as we have repeatedly noted, court-enforced merit selection programs.") By admitting to the conduct at issue—swearing, yelling, and returning the boilers—Brown is left attacking Thompson Distribution's leadership and business judgment. That will not suffice. *See Ballance*, 424 F.3d at 621 ("We do not sit as a super-personnel department with authority to review an employer's business decision as to whether

someone should be fired or disciplined . . . .") Accordingly, Brown did not present sufficient evidence of pretext.

### B.  Bernard Dubois

In addition to firing Brown, Thompson Distribution fired Dubois. In his deposition testimony, Thompson explained that Thompson Distribution fired Dubois because sales of hydraulic heating equipment—Dubois's area of sales—were very low. This satisfied Thompson Distribution's burden of production. The burden then shifted to Dubois to present evidence that Thompson Distribution's rationale was pretextual. Dubois, however, like Brown, admits to the underlying deficiency—Dubois acknowledges that his sales were low. Instead, Dubois claims that low sales of hydronic systems were not "attributable to any failure on his part," but rather because Thompson had neither the inventory nor a vendor for these systems. However, "simply shifting the blame for a problem does not establish pretext." *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 357 (7th Cir.1996) (citing *Schultz v. General Elec. Capital Corp.*, 37 F.3d 329, 334 (7th Cir. 1994)). That is because, as explained above, "in determining whether an employer's proffered reason for an employment action was pretextual, we are not concerned with the correctness or desirability of reasons offered for employment decisions, but rather the issue of whether the employer honestly believes in the reasons it offers." *Grayson v. O'Neill*, 308 F.3d 808, 820 (7th Cir. 2002). Dubois did not present "specific evidence from which the finder of fact may reasonably infer that the proffered reasons do not represent the truth," *Collier v. Budd Co.*, 66 F.3d 886, 893 (7th Cir. 1995). Therefore, Thompson Distribution was entitled to

summary judgment on Dubois's § 1981 claim.[6]

## C. Anna Perrey

As to Perrey, Thompson Distribution claims it fired her because she was insubordinate and unwilling to recognize Thompson as the new leader. In his deposition, Thompson stated that when he asked Perrey to perform certain functions, she responded along the lines of "we don't do it that way," or stated that she had to check with Mark Hague. In response, Perrey claims that she never refused to follow Thompson's directions, but rather that she did not know how to perform the tasks Thompson requested and thus she needed to check with Mark Hague for guidance. At most, this means that Thompson was mistaken in his belief that Perrey was being insubordinate. However, as noted above, "[p]retext requires more than showing that the decision was 'mistaken, ill considered or foolish.'" *Ballance*, 424 F.3d at 617 (quoting *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000). To avoid summary judgment, a plaintiff must present evidence showing that the employer did not honestly believe his proffered reason. *Jordan,* 205 F.3d at 343. Perrey has not done this. Moreover, the record confirms that Thompson honestly believed that Perrey was being insubordinate. Specifically, in his affidavit, Mark Hague stated that

---

[6] Because Dubois was not replaced, his claim also fails because he lacks evidence that a similarly situated individual outside the protected class was treated more favorably. *See, e.g., Gadsby v. Norwalk Furniture Corp.*, 71 F.3d 1324 (7th Cir. 1995) (holding that the district court properly granted the defendant summary judgment where the plaintiff failed to present evidence that he was replaced by someone outside the protected class).

Thompson approached him to discuss Perrey's refusal to follow his directions. Hague further stated that he told Thompson that Perrey just did not know how to do what he was asking her to do. Although Hague did not believe Perrey was being insubordinate, this testimony confirms that Thompson did. Without any evidence of pretext, then, Thompson Distribution was entitled to summary judgment on Perrey's race discrimination claim, as well.

### D. Cynthia Hague

Thompson Distribution also fired Cynthia Hague. In his deposition, Thompson explained that he fired Cynthia Hague because she was not proficient in the accounting system used by Thompson Distribution and because she spent office hours working on tasks related to wrapping up matters pertaining to the predecessor company, Mutual Pipe. Like the other plaintiffs, Cynthia Hague responds, not with evidence of pretext, but by complaining about being fired for these deficiencies. As to the accounting system, Cynthia admits she was not well versed in the program, but claims that Thompson knew that when he hired her. However, Thompson explained in his deposition that he believed Cynthia was more skilled at the accounting program than she turned out to be. Cynthia does not present any evidence to call into question Thompson's veracity. Cynthia also admits that she worked on closing out Mutual Pipe's books and drawing up a final financial report for Mutual Pipe, but claims that it was necessary to close down Mutual Pipe's records before inputting data relative to Thompson Distribution. Again, this merely calls into question Thompson's judgment—it does not constitute evidence of pretext.

**E. Mark Hague**

Finally, Thompson Distribution fired Mark Hague. In his deposition, Thompson explained several reasons for Mark Hague's firing: Mark Hague (along with Brown) allowed a boiler that Thompson believed belonged to him to be returned to a vendor; he sold products to customers at a margin below that set by Thompson Distribution; and he believed that Hague had informed several suppliers that Thompson Distribution would pay for goods and services that they had supplied to Mutual.

In response, Mark Hague, like the other plaintiffs, focuses not on whether Thompson honestly fired him for the proffered reasons, but rather on whether Thompson was right to fire him for those reasons. For instance, like Brown, Hague claims that the vendor owned the boilers, not Thompson Distribution. However, that does not address the question of whether Thompson honestly believed that he owned the boilers. Similarly, Mark Hague admits that he sold products below the margin Thompson set, but claims that was necessary because he would not be able to obtain any sales at a higher level. However, that was Thompson Distribution's decision and not Hague's call, and Hague cannot avoid summary judgment by challenging the wisdom of that choice. Hague finally claims that he did not tell suppliers that Thompson would pay for products Mutual had ordered. The record, however, shows that Thompson believed that to be the case, so at most, Hague has shown that Thompson was mistaken—not that he lied. Because Hague has not presented any evidence of pretext, Thompson Distribution is entitled to summary judgment on Mark Hague's race discrimination claim.

To this point, we have focused on the individual plaintiffs and their specific responses to Thompson Distribution's proffered reasons for their firings. As detailed above, the

plaintiffs admit to their personal performance problems and rather than present any evidence showing that Thompson Distribution did not honestly believe the reasons asserted, they merely rationalize their deficiencies. In addition to minimizing their personal performance problems, the plaintiffs argue that without documentation confirming the reasons Thompson proffered in his deposition testimony, a jury trial is required because a jury could disbelieve Thompson.

In support of their position, the plaintiffs cite *Dunn v. Nordstrom, Inc.*, 260 F.3d 778, 785-86 (7th Cir. 2001), asserting that in *Dunn*, this court observed that an employer's "inability to produce any documentary—rather than testimonial—evidence . . . is troubling." The plaintiffs, however, misrepresent the holding in *Dunn* by taking this quotation out of context and by slicing off the end of the quote. In *Dunn*, the employer claimed that it had changed the plaintiff's job title, not in retaliation for complaining about discrimination, but because it had changed the job titles of all of its midwest employees. In response to that assertion, this court noted: "Nordstrom's apparent inability to produce any documentary—rather than testimonial—evidence relating to the alleged across-the-board demotion of midwest region internal loss prevention leads is troubling because *one would expect* a large corporation to document the decision to demote so many employees." *Id.* (emphasis added) Conversely, with small businesses, one would not expect the owner to spend the time, or incur the expense, to document individual employment decisions.[7]

---

[7] The added expense of defending employment decisions in court has an obvious impact on small business owners. In this
(continued...)

Moreover, in arguing that a lack of documentation supports a finding of pretext, the plaintiffs confuse Thompson Distribution's burden with their own burden. An employer's burden is a burden of production (not the burden of proof). *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 845 (7th Cir. 1996). This "burden is not difficult to satisfy." *Id.* An employer need only "articulate[ ] lawful reasons for the action; that is, to satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus. *Tex. Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 257 (1981). Here, Thompson Distribution produced admissible evidence in the form of Thompson's deposition testimony, and in that testimony, Thompson explained several lawful reasons justifying the firing of the five plaintiffs. This satisfied Thompson Distribution's burden of production. *See, e.g., Rand*, 42 F.3d at 1145 (mere production of a legitimate non-discriminatory reason rebuts the presumption of discrimination created by the prima facie showing).

At this point, the burden remains with the plaintiffs to present evidence of specific facts that call into question the veracity of Thompson Distribution's proffered reasons. *Rand*, 42 F.3d at 1146. Merely asserting that a jury could disbelieve an employer's reason is insufficient. *Id.* Likewise, complaining that Thompson Distribution did not document the performance problems does not create an inference of pretext. *See Rand*, 42 F.3d at 1145 (rejecting plaintiff's argument that his employer's proffered reasons for his

---

[7] (...continued)
case, for instance, Thompson stated that as of June 2003, he had already incurred legal fees associated with this lawsuit which total nearly half of the profits he earned in 2002.

termination were pretextual because the employer never documented or communicated his performance problems). This is because in complaining about the lack of documentation, the plaintiffs are not really challenging the veracity of Thompson Distribution's proffered reason, but are rather attempting to impermissibly increase Thompson Distribution's burden from a burden of production to a burden of proof. This is impermissible. *See Burdine*, 450 U.S. at 256-57 (holding that "the employer's burden is satisfied if he simply explains what he has done or produc[es] evidence of legitimate nondiscriminatory reasons[,]" and reversing the appellate court's decision which "required much more: it placed on the defendant the burden of persuading the court that it had convincing, objective reasons for preferring the chosen applicant above the plaintiff") (internal citations omitted).

Similarly, the plaintiffs' complaints that Thompson Distribution failed to provide any written job descriptions and failed to conduct performance reviews, or provide them with information about their performance problems, also does not constitute evidence of pretext. *Id.* Again, as a small company, it is not surprising that Thompson Distribution did not conduct any formal performance reviews or provide written job descriptions. Such formalities are time-consuming and costly. In fact, Anna Perrey testified that she never received a performance review while working for Mutual. The record also indicates that Mutual lacked detailed job descriptions as well, as in taking over Mutual, Thompson Distribution asked the employees to fill out desk procedures for their jobs. Moreover, although Thompson Distribution did not conduct formal job reviews, the record shows that Thompson spoke to the plaintiffs on numerous occasions about their performance problems. Regardless, as noted above, the failure to communicate performance problems

does not constitute evidence of pretext. *Rand*, 42 F.3d at 1145.

The plaintiffs all also complain that at the time of their firing, Thompson did not tell them why they were being fired. That is not quite true. In firing the plaintiffs, Thompson told the plaintiffs either that they did not fit in the company or that the company would be moving forward without their services.[8] Although Thompson did not tell the plaintiffs the specific reasons they did not "fit," the fact that Thompson did not elaborate does not constitute evidence of pretext.[9]

The plaintiffs further attempt to avoid summary judgment by arguing that because Thompson Distribution did not follow the progressive disciplinary structure set forth in the

---

[8]   On appeal, Perrey also asserts that in firing her Thompson told her she had not done anything wrong and that that constitutes evidence that Thompson Distribution's proffered reasons were pretextual. That is not quite the exchange that took place, at least according to Perrey's deposition testimony. Perrey stated in her deposition that after Thompson fired her she asked "[d]id I do something wrong?" Perrey testified that Thompson responded, "No," but that when she pressed him further, he explained: "No. You just don't fit in with the future of Thompson Distribution." That explanation is entirely consistent with the rationale Thompson provides for firing Perrey—that she was insubordinate and unwilling to recognize Thompson as the new leader.

[9]   Plaintiffs cite *Wilson v. AM General Corp.*, 167 F.3d 1114, 1116, 1121 (7th Cir. 1999), for the proposition that failing to provide a reason for a termination constitutes evidence of pretext. *Wilson*, however, involved an employee fired after thirteen years of service, as opposed to a probationary employee. Moreover, unlike the plaintiffs in this case, Wilson had past exemplary performance evaluations. Thus, *Wilson* is distinguishable.

company handbook, Thompson Distribution's reasons for firing them were pretextual. The handbook, while establishing a progressive disciplinary structure, also reserved for Thompson Distribution the right to fire employees (including those who were not probationary) immediately, providing: "The company may decide, in its discretion, that a first offense in a specific situation will result in discharge." Because Thompson Distribution did not violate its own policies, this does not constitute evidence of pretext. *Rand*, 42 F.3d at 1145 (holding that since the employer's policy did not obligate the employer to communicate problems, the failure to do so does not constitute evidence of pretext). *Compare with Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F.3d 976, 980 (7th Cir. 2000) (holding that where an employer's progressive disciplinary policy *precluded* the plaintiff's firing, that constituted evidence of pretext) (emphasis added).[10]

As detailed above, the plaintiffs did not present any evidence that Thompson Distribution's proffered reasons for their firing were pretextual. At oral argument, the

---

[10] Thompson testified in his deposition that the progressive disciplinary mechanism did not apply to employees during the ninety-day trial period. The plaintiffs argue in response that the Handbook did not exclude probationary employees from the progressive disciplinary structure. However, the Handbook expressly provided that: "A 90-day trial period is provided for new employees to evaluate the opportunities of continued service with the company and, likewise, for the company to evaluate the new employee for continued service with the company." It would not make sense to apply a progressive disciplinary structure during a 90-day trial period, but since the Handbook expressly provided for discharge for the first offense, whether the progressive disciplinary mechanism applied to probationary employees is immaterial.

plaintiffs' attorney made a last-ditch effort to avoid summary judgment by repeatedly stressing the racial composition of Thompson Distribution's workforce. In fact, after "may it please the court," the plaintiffs' attorney's next sentence was: "By admission of even the defendant this is a case of the only five caucasians working and employed at Thompson Distribution being fired simultaneously by an African-American business owner . . . ." We then asked: "You said they were the only five. There were fourteen employees, right." The plaintiffs' attorney responded, "exactly," and this court continued: "And all the rest were black?" The plaintiffs' attorney then stated: "That is my knowledge. And that has not been disputed in the record." Later, in the oral argument, when the plaintiffs' attorney continued to argue for a jury trial, this court again returned to the issue of the racial composition of the workforce, by asking whether the plaintiffs' attorney's position was that without documentation of a performance problem, a jury trial is required because of "[t]he fact that all of the white people were fired and replaced by black people." The plaintiffs' attorney responded: "Yes, that's the fundamental point."[11]

However, this fundamental point is flawed both factually and legally. First, contrary to the plaintiffs' attorney's representation, the record, or at least those portions provided to this court, establishes that when Thompson Distribution began operations, in addition to the five white plaintiffs, Thompson Distribution also hired Mary Coleman and Bob McClellan, both of whom were white, as part of the

---

[11] In concluding his argument, the appellants' attorney once again stressed the need for a jury trial, where "you have five whites, the only whites employed at the time at Thompson Distribution, all replaced by African-Amercians, except one. . . ."

initial fourteen-person workforce.[12] The record also shows that although Thompson never replaced Dubois with a salesperson dedicated to handling hydraulic sales, after firing Dubois, Thompson Distribution hired David Shank, who is white, to handle sales. The plaintiffs also ignore evidence showing that Thompson Distribution, which at the time of summary judgment only employed nine employees, had during its time of operations terminated at least six black employees. Thus, contrary to the plaintiffs' portrayal, we do not have here a case of a black business owner firing only white employees and hiring only black replacements.

Moreover, even if we had that case, legally that is insufficient to establish pretext. The plaintiffs must do more than merely point to race and proclaim: "Aha! Discrimination." We stressed this point in *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1176-77 (7th Cir. 2002), wherein the plaintiffs attempted to create an inference of discrimination by pointing to "the fact that no blacks were hired during a two-year time frame . . . ." We held in *Millbrook* that, at best, such evidence was anecdotal, and that we "cannot find discrimination on such a thin basis." *Id.* at 1177 (quoting *Kuhn v. Ball State Univ.*, 78 F.3d 330, 332 (7th Cir. 1996)). As we explained, if the plaintiffs rely on the racial composition of a workforce as evidence of discrimination it must "subject all of the employer's decisions to statistical analysis to find out whether [race] makes a difference." *Id.* (quoting *Kuhn*, 78 F.3d at 332.) Thus, like *Millbrook*, without knowing how many positions became available during the relevant time frame, the number and race of the candidates applying for those positions, and the candidates' relative qualifications, "[s]uch a list is next to worthless." *Millbrook*, 280 F.3d at 1177. See

---

[12] The record also shows that Thompson Distribution did not fire the plaintiffs simultaneously, but rather fired the Hagues on February 15, 2001, and the remaining plaintiffs one week later.

also *Odom v. Frank*, 3 F.3d 839, 849 (5th Cir. 1993) (raw data of age, race, and location of persons promoted from 1980-1983, "without more, is not competent to prove anything"). Lacking such evidence here, the plaintiffs' focus on the racial composition of the workforce is misplaced, both factually and legally.

## III.

Thompson Distribution hired the five plaintiffs for a ninety-day trial period. As that period neared its end, Thompson Distribution decided that the plaintiffs were not a good fit, for a variety of reasons. The plaintiffs admit to the underlying conduct at issue, but rationalize and minimize their failures. However, this court is not a personnel director, judging the fairness of employment decisions. Rather, this is a discrimination case, and to avoid summary judgment, the plaintiffs must present evidence of pretext. They did not do so. Accordingly, the district court properly granted Thompson Distribution summary judgment on the plaintiffs' § 1981 race discrimination claim. We AFFIRM.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*