# In the
# United States Court of Appeals
## For the Seventh Circuit

---

No. 06-2955

GLORIA BANNON and JACQUELINE BURTON,

*Plaintiffs-Appellants,*

*v.*

THE UNIVERSITY OF CHICAGO,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 3081—**William J. Hibbler**, *Judge.*

---

ARGUED MAY 2, 2007—DECIDED OCTOBER 1, 2007

---

Before EVANS, WILLIAMS, and SYKES, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Gloria Bannon and Dr. Jacqueline Burton both sued The University of Chicago, operator of the Argonne National Laboratory where both plaintiffs worked. Bannon, a woman of Mexican ancestry, claims her supervisor leveled racial epithets at her and repeatedly blocked her attempts to gain promotion from a secretarial position to a supervisory one because of her national origin. Further, Bannon says that after winning promotion in November 2002, she was "frozen out" of opportunities in retaliation for reporting funding irregularities. Bannon began a medical leave in February 2003, and never returned to work. Instead, she initiated this

action, claiming she was: (1) denied promotion because of her national origin, (2) subjected to a hostile work environment, and (3) constructively discharged in violation of Title VII of the Civil Rights Act. Burton, a white female, claims the university violated Title VII by denying her a promotion to senior scientist because of her gender and that she was fired in retaliation for reporting improper billing practices, and not for the reason provided by the school—a failure to report a conflict of interest.

The district court dismissed Bannon's retaliatory constructive discharge claim on the pleadings and granted summary judgment to the defendant on all other claims. We affirm as to Bannon because: (1) she has no timely failure-to-promote claim; (2) she did not establish that she found her workplace subjectively hostile; (3) her IIED claim is partially preempted and she was not the victim of extreme and outrageous conduct; and (4) Illinois does not recognize a cause of action for retaliatory constructive discharge. With respect to Burton, we affirm because she never applied for the promotion and cannot show that the reason given for her termination was pretextual.

## I. BACKGROUND

Because this case is at the summary judgment stage, we summarize the facts as related by Bannon and Burton. *See Perez v. Illinois*, 488 F.3d 773, 776 (7th Cir. 2007). Bannon's claims focus on her relationship with her supervisor at Argonne, Christopher Reilly. She began working as Reilly's executive secretary in 1989. Initially the job went smoothly, and Bannon received frequent raises. In the 1990s, however, Reilly started using racial slurs, calling her "wetback" and "brown cow," for instance. A few years later he heard other employees refer to Bannon as a

"Mexican terrorist in a miniskirt" and began to call her that too. Bannon told him to "knock it off" when he made some of these remarks. In 2001, when Bannon told Reilly where she thought he might find a document, he told her, "I don't know how that Mexican brain of yours works." He made similar comments to her when she asked him about what she thought were questionable accounting practices, telling her that she couldn't understand figures because of her "Mexican brain." On at least one occasion, this comment was made in the presence of another employee.

Bannon also contends that Reilly blocked her chances for promotion within the lab. In 1997, the lab posted a vacancy for a more senior project analyst position. Bannon wanted to apply, but Reilly refused to recommend her. Bannon needed his recommendation to be considered for the promotion so she did not apply. The same thing happened when the position became available again in 1998. In 2001, when the position became available for the third time, Reilly did not immediately post it. Instead he told Bannon that, if she took on many of the duties of the project analyst position while continuing to work as his secretary, he would create a new position for her that would be at a slightly higher pay grade than the project analyst job. Bannon agreed to do this. When she reiterated her interest in a promotion to Reilly during this time, he asked her if she "swam across the border or walked across the desert."

Reilly was unable to create a new position for Bannon, apparently because the human resources department would not authorize it. However, Bannon did receive another raise as compensation for the extra work she had done. In August 2002, after over a year's delay, Reilly posted the project analyst position. Bannon applied for it in early September 2002, and when she informed Reilly

that she had done so, he became very angry, screamed at her, and called her a "stupid Mexican." Nonetheless, this time Reilly did not block Bannon's promotion. In mid-September, Jacqueline Burton, who would be supervising the new project analyst and had been reviewing the applications for the position, told Reilly she wanted Bannon to have the job. At the end of the month, Reilly sent a letter to human resources asking them to give the job to Bannon.[1] Bannon received the promotion in October, and it became effective on November 1, 2002.

Bannon did not report Reilly's behavior to his superiors, and in spite of all the problems she was having with him, she admits that they socialized together outside of work and that she "did not mind, and even enjoyed" some of these events. She and her husband even went on a week-long trip with Reilly and his wife in 1998. She also admits sending him a card in October 2002 in which she referred to him as a "great boss" and invited him to lunch.

After her promotion, Burton became Bannon's immediate supervisor, but Burton was fired by Argonne in January 2003. Lorraine LaFreniere replaced her, and at this point Bannon began having trouble at work again. She was excluded from meetings that she used to participate in and was no longer allowed to organize and coordinate meetings although that had previously been one of her job duties. She felt that she was being "frozen out" of her department after Burton's termination. She was also deeply upset by two incidents in which she was accused of wrongdoing by Mark Jones, Argonne's general counsel. In October of 2002, he accused her of falsifying her over-

---

[1] Although the defendant produced a copy of this letter dated September 27, 2002, Bannon disputes whether it was ever sent. However, she has presented no evidence showing that it was not sent on the same day that it was dated.

time. Bannon's lawyers told Jones that any further questions about her overtime should be directed to them, and that was the last she heard about the issue. Then in January 2003, Jones accused her of removing boxes of Argonne property without permission. She told him that she only removed personal items, and nothing more came of this accusation. Bannon was so upset by her treatment at Argonne that she took extended leave in February 2003 and resigned a few months later.

Jacqueline Burton's claims arise out of two incidents. The first occurred in 2001, when she expressed interest in being promoted to a senior scientist. Reilly, as Burton's immediate supervisor, was responsible for submitting her application materials to the Associate Lab Director, Harvey Drucker, who would ultimately decide whether to promote her. Reilly did not submit Burton's materials because, he says, she did not give him everything that was needed to complete her application. Specifically, he says that she did not give him a list of scientific peers who would be willing to write reference letters. Burton does not deny that she failed to submit the list, but contends that it was Reilly's responsibility to ask for it, and he never did. She asserts that he failed to collect all the information he needed from her because he was biased against her because of her gender. She points out that in September 2002, he told Bannon that Burton was a "dyke" and a "bitch" and that her marriage was a "sham."

The second incident involves Burton's termination from Argonne. In 2002, Argonne discovered that Burton's husband, John Walker, who also worked for Argonne, had been doing consulting work on the side for an Argonne vendor named Air, Soil, & Water (ASW). After investigating, Argonne discovered that Walker had earned a total of $56,000 from ASW while he was still employed by

Argonne. Drucker believed that this was a significant conflict of interest for both Burton and Walker and was upset that neither one had reported it to the company. He terminated Burton and Walker on account of this conflict in January 2003. Burton believes that she was really terminated because she expressed concerns about questionable accounting practices to Reilly, and she appealed her termination to both Drucker and an independent review committee. The termination was upheld, and the FBI ultimately investigated Burton's and Walker's relationship with ASW. As far as we know this investigation is still ongoing.

## II. ANALYSIS

We review the district court's grant of summary judgment de novo, drawing all reasonable inferences in favor of the non-moving parties. *Perez*, 488 F.3d at 776. Summary judgment is appropriate if there are no disputed material facts and the moving party is entitled to judgment as a matter of law. *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 914-15 (7th Cir. 2007), *petition for cert. filed*, 76 U.S.L.W. 3001 (U.S. June 19, 2007) (No. 06-1694).

Likewise, our review of a district court's grant of judgment on the pleadings, *see* Federal Rule of Civil Procedure 12(c), is de novo. *Moss v. Martin*, 473 F.3d 694, 698 (7th Cir. 2007). "Only when it appears beyond a doubt that the plaintiff cannot prove any facts to support a claim for relief and the moving party demonstrates that there are no material issues of fact to be resolved will a court grant a Rule 12(c) motion." *Id.* With these standards in mind, we begin with Bannon's Title VII and state-law claims.

**A. Bannon's Title VII Claims**

**1. Failure to Promote**

The defendant argues that Bannon has not established a timely failure-to-promote claim. Bannon does not meaningfully respond to this argument, and we think it is dispositive. Bannon had to submit her claim to the EEOC within 300 days of the failure to promote. 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002); *Salas v. Wis. Dep't of Corrs.*, 493 F.3d 913, 921 (7th Cir. 2007). She submitted her claim on July 14, 2003. As a result, she can only sue for events that happened on or after September 17, 2002.[2] Therefore, to the extent her failure-to-promote claim is based on Reilly's refusal to recommend her for promotion in 1997 and 1998, it is time-barred. The other event that arguably constitutes a failure to promote is Reilly's decision in 2001 not to post the project analyst position as soon as it became available—a decision that ultimately led to Bannon taking on many of the duties of a project analyst without receiving the corresponding promotion. But Reilly posted the job in August 2002, so any delay in making this promotion available to Bannon ended at that point, outside of the limitations period.

However, Bannon also argues that, when she finally applied for the project analyst position in September 2002, Reilly "delayed" her promotion for two months until November. This claim would fall within the limitations period, and a delay in promoting an employee can consti-

---

[2] The parties dispute whether Bannon filed her EEOC charge on July 14, 2003 or August 12, 2003. It ultimately makes no difference to the resolution of Bannon's claims, so we give her the benefit of the doubt and assume she filed her charge on July 14.

tute an adverse employment action, *see Cullom v. Brown*, 209 F.3d 1035, 1042 (7th Cir. 2000). But we do not think that the two-month gap in this case between the time Bannon applied for and received her promotion qualifies as an adverse employment action. Employees cannot expect to be promoted the instant they apply. Some lag time has to be allowed for the application to work its way through the administrative process and for the employer to consider other candidates.

The record suggests that this is exactly what happened in Bannon's case. She submitted her application to Burton in early September, and Burton took some time to review it along with the applications of other candidates. In mid-September, Burton informed Reilly that she had selected Bannon for the job. Just nine days later Reilly recommended Bannon for the job to human resources. It then took human resources some time to act on the recommendation, and the company officially awarded the job to Bannon in October, to take effect on the first day of the following month. The only "delay" in this sequence of events that can be attributed to Reilly is the nine days between Burton telling Reilly she had selected Bannon and Reilly's request to human resources that Bannon be given the job. It is not unreasonable for a supervisor to take nine days to process a promotion application, especially when the supervisor likely has other tasks. Therefore, the district court did not err in granting summary judgment on this claim.

### 2. Hostile Work Environment

This is the strongest of Bannon's claims. To succeed with this claim she has to show that her work environment was both subjectively and objectively offensive. *Boumehdi v. Plastag Holdings*, 489 F.3d 781, 788 (7th Cir. 2007). Bannon correctly points out that the district court

erred by refusing to consider racial slurs made by Reilly outside the limitations period. When a plaintiff makes a hostile work environment claim, the court should consider harassing incidents that occur outside the limitations period as long as at least one harassing incident occurred within the period. *Morgan*, 536 U.S. at 116-17; *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 385 (7th Cir. 2007). At least some of the racial slurs took place within the limitations period so all of Reilly's comments are fair game. And, we agree with Bannon that being repeatedly called a racist slur by one's boss can be considered objectively offensive treatment, *see Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 950-51 (7th Cir. 2005), especially when those slurs are made in the context of comments denigrating one's intelligence—as when Reilly told Bannon that her "Mexican brain" couldn't understand figures.

However, Bannon has not established that she considered her workplace to be subjectively offensive. She has admitted that she socialized with Reilly outside of work not once but several times during the same period when she says he was harassing her. Furthermore, one of these social events—a week-long vacation that Bannon and Reilly took together with their spouses—was more prolonged and extensive than typical socializing among office colleagues. Bannon argues that she only socialized with Reilly because she feared his anger if she refused his invitations, but we note that on at least one recent occasion in October 2002—when she invited him to lunch in the card praising him as a "great boss"—she initiated the contact. She also failed to report Reilly's behavior to his superiors at Argonne even though the conduct she complains of continued for at least five years. *See Wolf v. Nw. Ind. Symphony Soc'y*, 250 F.3d 1136, 1144 (7th Cir. 2001) (plaintiff did not show that he found treatment by supervisor subjectively offensive when he did not

complain about treatment and sent supervisor a letter telling her she was a good boss and he wanted to maintain their friendship); *cf. Kampmier v. Emeritus Corp.*, 472 F.3d 930, 942 (7th Cir. 2007) (questioning whether plaintiff who maintained some social ties with alleged harasser subjectively viewed harassment as offensive but ultimately concluding that plaintiff's repeated complaints to supervisors about harasser's conduct raised a fact issue on this point). We think that Bannon's failure to report Reilly's behavior over this long period of time combined with the unusually extensive social relationship she maintained with him would prevent a reasonable jury from finding that she subjectively viewed her work environment as hostile. So, although it is a closer call, we conclude that the district court did not err in granting summary judgment on this claim.

### 3.   Constructive Discharge Claim

Bannon bases her Title VII constructive discharge claim on the same conduct that underlies her hostile work environment claim. But to succeed in a constructive discharge claim, Bannon has to show more than a hostile work environment. She has to show that her working environment was so intolerable that resignation was a fitting response. *See McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 2004). Because we have decided that Bannon has not made the necessary showing to support her hostile work environment claim, it follows that her constructive discharge claim fails. *See Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 463 (7th Cir. 2007). Furthermore, Bannon has not presented sufficient evidence to connect her resignation to her ethnicity. Reilly is the only person Bannon says denigrated her ethnic background, but when Bannon resigned she had been promoted and was no longer under Reilly's direct supervision.

Instead her resignation seems to have been prompted by her new supervisor, Lorraine LaFreniere's actions in "freezing her out" of some of her job duties and by her distress over the investigations Argonne's general counsel, Mark Jones, conducted into her behavior. Bannon has never suggested that either LaFreniere or Jones harbored any bias towards Hispanics.

## B.  Bannon's State-Law Claims

Bannon also made two state-law claims, intentional infliction of emotional distress and retaliatory constructive discharge. The district court decided, and the defendant now argues, that Bannon's claim for intentional infliction of emotional distress was preempted by the Illinois Human Rights Act (IHRA). Whether a state-law tort claim is preempted depends on whether the IHRA "furnish[es] the legal duty that the defendant was alleged to have breached." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 604 (7th Cir. 2006). If the plaintiff's allegations against the defendant implicate only a duty provided by the IHRA, such as the duty of employers to refrain from discriminating against employees on the basis of their race or national origin, then the plaintiff's claim is preempted. *Id.* In this case, Bannon's primary allegation is that Reilly caused her emotional distress by his use of racial slurs. It is Reilly's alleged breach of his duty under the IHRA to refrain from discrimination that Bannon claims caused her distress. It is true, as Bannon points out, that her claims are not entirely based on Reilly's discriminatory behavior—so her claim may not be entirely preempted. She also asserts that she was distressed by being "frozen out" of her job duties and investigated by Jones. In addition, it is possible to view Bannon's allegations against Reilly as being independent of any duty imposed by the IHRA. For example, she could be

claiming that, regardless of his motivation, his hostile attitude towards her and denigration of her intelligence caused her distress. But this does not help Bannon since the conduct she complains of—being excluded from some meetings, being denied the responsibility of organizing meetings, being forced to attend a few unpleasant sessions with Argonne's general counsel that led to no disciplinary action, and having a mean boss who sometimes told her she was stupid—does not qualify as "extreme and outrageous" conduct. Rather it is the kind of ordinary workplace stress that is not actionable. *See Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 867-68 (Ill. App. Ct. 2000) (plaintiff's temporary reassignment and demotion were not extreme and outrageous; investigations of employees undertaken for legitimate purpose are not extreme and outrageous).

As for Bannon's final claim, retaliatory constructive discharge, the district court correctly concluded that Illinois law does not recognize such a claim. *See Fisher v. Lexington Health Care, Inc.*, 722 N.E.2d 1115, 1121 (Ill. 1999); *see also Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 708 (7th Cir. 2004) (collecting cases).

## C.  Burton's Title VII and State-Law Claims

### 1.  Failure to Promote

Burton first contends that Reilly stymied her promotion on account of her gender when he failed to ask her for her references, thus ensuring that her application for promotion would be incomplete. Burton attempts to prove this claim under the indirect method. Therefore, she must show that she is a member of a protected class, was qualified for the promotion, was denied the promotion, and that similarly situated employees outside the protected class were treated more favorably. *Perez*, 488 F.3d at 776;

*Pantoja v. Am. NTN Bearing Mfg. Corp.*, No. 06-1252, 2007 WL 2230095, *4 (7th Cir. Aug. 6, 2007) (suggesting alternate manner of satisfying prima facie case). She argues that a genuine issue of material fact exists about whether she or Reilly was responsible for compiling her references and whether Reilly ever asked her for references. But even if we assume that Reilly was responsible for compiling the references and never asked Burton for them, she has still failed to establish the third and fourth elements of the indirect method. First, she has not shown that she was denied a promotion to senior scientist because she cannot show that she even applied for this promotion. Even if Reilly was responsible for compiling Burton's references, he could not do this until she told him whom she wanted to serve as references. Yet Burton does not deny that she failed to provide him with even this minimal amount of information. Burton faults Reilly for not asking for this information, but we do not see how his failure to ask prevented Burton from submitting a complete application. Argonne has submitted its policy on promotions which clearly shows that references are required for promotion to senior scientist. Burton does not contest the accuracy of this document or seriously contend that references were not required. Nor does she say that Reilly misled her by telling her that this rule would not apply to her. Therefore, she should not have needed a request from Reilly to know that she had to give him at least a list of references before her application for promotion would be complete. Finally, Burton has not presented evidence that Reilly took more initiative when compiling references from male candidates for promotion.

### 2. Retaliatory Discharge

Burton's claim that she was discharged in retaliation for informing Reilly about questionable accounting prac-

tices is also without merit. To succeed on this claim, which is brought under Illinois law, Burton must show that she was discharged in retaliation for her activities and that the discharge violates public policy. *Hartlein v. Ill. Power Co.*, 601 N.E.2d 720, 728 (Ill. 1992). If the employer offers a legitimate, nondiscriminatory reason for the discharge, the employee must show that the reason is pretextual. *Gomez v. The Finishing Co.*, 861 N.E.2d 189, 197-98 (Ill. App. Ct. 2006). On appeal, Burton's only argument is that Argonne's stated reason for firing her, her failure to report her husband's $56,000 worth of consulting work for an Argonne vendor, was pretextual because Argonne's conflicts policy by its terms does not apply to consulting fees.[3] We do not think the terms of Argonne's conflicts policy establish pretext. First, contrary to Burton's contention, the conflicts policy can be read as applying to consulting fees. In any case, Burton is essentially arguing that Argonne erred in applying its conflicts policy to her situation. Even if this were true, there is a difference between a mistake and a lie. The fact that Argonne's

---

[3] In her reply brief, Burton also argues that Argonne's stated reason for her discharge was pretextual because in 1999 (three years before Argonne investigated Burton's conflict) Drucker told her that there was no need to report conflicts involving Argonne's partners in a special program called QuickSite. Burton says that ASW was a QuickSite partner, and thus it was disingenuous for Drucker to fire her for not reporting a conflict with ASW when he had already told her that conflicts with QuickSite partners like ASW did not have to be reported. This argument is waived because it was not presented in Burton's opening brief. *See United States v. Dabney*, No. 06-2192, 2007 WL 2200481, at *4 (7th Cir. Aug. 2, 2007). In any case, this argument also disregards the fact that, even if Drucker gave Burton mixed signals about whether work for ASW presented a conflict, Drucker's initial decision to fire her was ultimately reviewed and upheld by an independent committee of Argonne officials.

stated reason for firing Burton may have been mistaken does not mean it was pretextual. *See Miller v. J.M. Jones Co.*, 587 N.E.2d 654, 661 (Ill. App. Ct. 1992) (question is not whether employer treated employee fairly but whether discharge was retaliatory).

In addition, Burton has presented no evidence to show that Drucker knew that she had questioned Reilly about accounting practices when he made the initial decision to fire her. She makes a half-hearted attempt to suggest that Reilly was the real decision-maker, in contradiction to what both Reilly and Drucker said in their affidavits, but she has not presented sufficient evidence to support this allegation.

### III.  CONCLUSION

For the above reasons, we AFFIRM the judgment of the district court.

A true Copy:

       Teste:

 

             _____
             *Clerk of the United States Court of*
                 *Appeals for the Seventh Circuit*