NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 12, 2007
Decided May 13, 2008

**Before**

WILLIAM J. BAUER, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

No. 06-4071

| | |
|---|---|
| JAMES W. CURRY, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Northern District of Illinois, Eastern Division |
| *v.* | |
| | No. 05 C 3209 |
| R. JAMES NICHOLSON, Secretary, U.S. Department of Veterans Affairs, | David H. Coar |
| *Defendant-Appellee*. | *Judge*. |

**O R D E R**

James W. Curry sued the Secretary of the United States Department of Veterans Affairs, claiming that he was subject to racial discrimination and age-based discrimination, in violation of Title VII of the Civil Rights Act and the Age Discrimination in Employment Act, *see* 42 U.S.C. §§ 2000e-1 to 2000e-17; 29 U.S.C. §§ 621 to 634. The district court granted the VA's motion for summary judgment. We affirm.

In 1987 Curry, who is black, began working as Chief of Police at the Westside Veterans Affairs Medical Center[1] ("Westside VA") in Chicago. In 1996 he began serving in the same capacity for the larger VA Chicago Health Care System after an administrative merger of Westside VA with the Lakeside VA Medical Center ("Lakeside VA"). At all times relevant to this litigation, Curry's supervisor was Michelle Blakely, who consistently gave Curry satisfactory formal evaluations between 2001 and 2004. Blakely, however, acknowledged being aware of complaints regarding Curry's performance.

The heightened security that followed September 11, 2001, severely strained the police force; staff levels were often inadequate, overtime was compelled, and morale was low. After seven anonymous complaints were made about mismanagement, local VA director Richard S. Citron convened an Administrative Board of Investigation ("ABI") to investigate. Ultimately, the ABI found that five of the seven complaints were not substantiated, and Curry was not faulted in the two that were. The ABI did not mention any failings by Curry in its report about these complaints. Citron also directed the ABI to investigate allegations of questionable recruiting practices by Curry, but no evidence of wrongdoing by Curry was uncovered. Citron later launched a third investigation after a patient suffered a brain hemorrhage and skull fracture as a result of a fall during a scuffle with a police officer at the Westside VA. The officer was exonerated, however, and Curry was not disciplined.

But in June 2004 the persistent complaints of mismanagement prompted VA Network Director Joan Cummings (Citron's supervisor) to request an additional inspection of the police service. Cummings called the Office of Security and Law Enforcement ("OSLE"), which is based in Washington D.C. and has final oversight over all VA police services. The OSLE is part of the Department of Veterans Affairs and is separate from the Veterans Health Administration, according to Curry. This non-routine inspection by an independent body from Washington, D.C., provides some indication that top officials at the VA were concerned about mismanagement at the Westside VA.

Curry learned about the week-long inspection in advance and had daily contact with the OSLE inspectors from Washington. The inspectors asked that Curry and Blakely not attend their exit interview with Citron. The inspectors also declined to release their findings in time to permit rebuttal from Curry and Blakely. In their presentation to Citron on July 9, 2004, the OSLE investigators concluded that the operation of the police service was

---

[1] The Westside VA has since been renamed the Jesse Brown VA Medical Center, but the district court and the parties have continued to use the original name, and so for simplicity we will follow their practice.

unsatisfactory and that Curry had systemically failed to manage the police program properly. The investigators recommended that Citron re-assign Curry as an initial step to correct the problems. Later that month the investigators issued a written inspection report, noting "grave concerns about the continued ability of the Police Chief to manage the Police Service." The inspectors confirmed allegations that Curry had engaged in questionable hiring practices and that the police service was being mismanaged, was using outdated operating procedures and policies, had staffing shortages, was using excessive overtime, and had been implicated in a scuffle with a patient that resulted in the patient's injury. The inspectors also criticized Blakely's oversight of Curry.

Curry did not receive a copy of the OSLE's written report when it was issued at the end of July 2004. However, it is clear that on July 12, 2004, three days after the exit interview, Citron met with Curry, informed him that the police service did not do well during the inspection, and told him that he would be reassigned immediately to work at Lakeside VA under a new supervisor; Citron also gave Curry a letter to this effect. The parties agree that Curry's pay and grade remained the same, and Citron's letter indicated that Curry's "tour of duty will remain the same, but [his] duty location is changed." At the time of his reassignment, Curry was detailed to "Unclassified Duties"; later this became a permanent reassignment with the title "Program Specialist." Curry, though, told Citron during their meeting that he intended to retire, and afterward he met with a human resources specialist, Michael Harvey, to discuss retirement. Harvey promised to start the necessary paperwork, and Curry then went on what turned out to be a three-month sick leave, during which he communicated with some staff members but did not report to work. Curry was replaced as Chief of Police by Jerry Brown, who is also black.

While still on sick leave, Curry filed a charge of discrimination with the VA Office of Resolution Management, claiming he was reassigned involuntarily on the basis of his race and age. On or around October 18, 2004, however, Curry reported to work at the Lakeside VA, under the supervision of Harold Rhein. On his first day back, after sitting about two hours in his new office without work to do, Curry told Rhein that he was going to retire and left to speak with Harvey again about his paperwork. On November 1, 2004, Curry formally retired.

Curry filed a complaint in the district court claiming that he was subject to discrimination on the basis of his race and age. After discovery, the VA moved for summary judgment. At a hearing on the VA's motion, Rhein testified that before Curry's first day back, Blakely already had told him that Curry intended to retire, and that his impending departure restricted the work he could assign to Curry. Curry contends that he did not voluntarily retire but instead felt compelled to retire because Rhein did not assign him any work. Rhein counters that he did assign Curry to update security policies but that

Curry never produced any work product because he spent most of his time working on his retirement papers. The district court granted the VA's motion. Noting that Curry did not argue that he had direct evidence of discrimination, the court proceeded to analyze Curry's discrimination claims under the indirect, burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). To set forth a prima facie case of discrimination under the indirect method, Curry had to show that (1) he was a member of a protected class, (2) he was meeting his employer's legitimate job expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees outside of the protected class were treated more favorably. However, the court did not make an explicit determination concerning whether Curry had established a prima facie case of discrimination. Instead, he noted that Curry's satisfactory work evaluations did not demonstrate that he was meeting his employer's legitimate expectations, given the OSLE's evidence of serious problems in the police force. With this observation, the court proceeded directly to the burden-shifting analysis of whether there was a legitimate, non-discriminatory reason for the transfer. The court concluded that Curry had failed to establish that the reasons for his reassignment were pretextual. *See id*. at 804. Instead, according to the district court, Curry attempted to undermine the VA's reasons with "a variety of unconvincing arguments and vague conspiracy theories."

I.      Constructive discharge

On appeal Curry has abandoned his claim of age discrimination, and only his claim of race discrimination remains. *See Bannon v. Univ. of Chi.*, 503 F.3d 623, 632 n.3 (7th Cir. 2007). Curry first argues that he suffered a constructive discharge when he was transferred to the new location. He acknowledges that his grade and pay remained unchanged, but maintains that he was constructively discharged because he reported to work for approximately two weeks at the end of October 2004, only to find that he had no job duties of any kind.

Constructive discharge can take two different forms. *Fischer v. Avanade*, 519 F.3d 393, 409 (7th Cir. 2008). In order to establish the first form of constructive discharge, a plaintiff must show that unlawful discrimination made his working environment so intolerable that a reasonable person would be forced to resign. *Bannon*, 503 F.3d at 629-30; *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789 (7th Cir. 2007). To support a claim for constructive discharge, a plaintiff's working conditions "must be even more egregious than the high standard for hostile work environment claims." *Id*. Otherwise, an employee is expected to remain employed while seeking redress. *Boumehdi*, 489 F.3d at 789. Therefore, Curry has to clear a "high bar" to prove he was constructively discharged. *Id.; see also Taylor v. W. S. Life Ins. Co.*, 966 F.2d 1188, 1191, 1199 (7th Cir. 1992) (recognizing that jury could find constructive discharge where plaintiffs' boss constantly made racist comments, brandished

a pistol, and held it to one plaintiff's head); *Brooms v. Regal Tube Co.*, 881 F.2d 412, 417, 420 (7th Cir. 1989) (holding that constructive discharge was established where defendant's "repeated instances of grossly offensive conduct and commentary" culminated in an incident where a co-worker showed the plaintiff a racist pornographic photograph, told her that she was hired to perform the task depicted in the photograph, grabbed the plaintiff, and threatened to kill her). Curry has not suggested that he suffered any harassment, so his claim clearly does not fit into the first form.

The second form—"[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge"—also does not fit the facts of Curry's case. *See Fischer*, 519 F.3d at 409; *EEOC v. Univ. of Chi. Hosp.*, 276 F.3d 326, 332 (7th Cir. 2002). In other words, constructive discharge also occurs where, based on an employer's actions, "'the handwriting [was] on the wall' and the axe was about to fall." *Fischer*, 519 F.3d at 409 (quoting *Lindale v. Tokheim Corp.*, 145 F.3d 953, 956 (7th Cir. 1998)).

Curry was not told he was to be terminated. Rather, he was transferred to a different job at the same pay. Curry has not cited any legal authority to support his contention that not being given work for two weeks—if in fact that was what occurred—would compel a reasonable person to resign because it was obvious that termination was inevitable.[2] Moreover, it is clear from Curry's own deposition testimony that he made the decision to retire months before he reported to work for Rhein. The facts indicate that Curry made the decision to retire before giving his new position and new supervisor a chance. He presents no evidence that the VA was unwilling to keep him on as an employee. Curry thus did not carry his burden of showing a genuine issue of material fact with respect to constructive discharge. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

II.       Prima facie case under *McDonnell Douglas*

          A.       Adverse employment action

---

[2] This "two-week" period is the time between when he showed up for work at Lakeside VA on October 18 and when he formally retired on November 1. However, on November 18, after sitting at his desk for two hours "with nothing to do," Curry informed Supervisor Rhein that he was going to retire, and then met with Harvey to discuss the retirement process. This is apparently the same two-week period that Rhein claims to have given Curry the assignment to update security policies. Thus Curry's final decision to retire (he had informed others earlier) apparently came after only two hours of no work, not two weeks.

We turn now to the question of whether Curry has made out a prima facie case of employment discrimination. Curry's constructive discharge claim clearly fails; what is less clear is whether he has established that his reassignment itself constitutes an adverse employment action sufficient to satisfy the *McDonnell Douglas* requirement. We have noted that "the range of employer conduct that constitutes an adverse employment action is broad, but not unlimited." *Johnson v. Cambridge Indus.*, 325 F.3d 892, 902 (7th Cir. 2003). An adverse employment action must be more disruptive than a mere inconvenience or an alteration of job responsibilities. *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993). Such an action could be a termination of employment, a demotion evidenced by a decrease in wages or salary, a less-distinguished title, a material loss of benefits, a significant decrease in material responsibilities, etc. *Id.*. Curry's change in title, his transfer to a new location, and his loss of his position as Chief of Police arguably suggest that he suffered an adverse employment action, but on the other hand he suffered no loss of benefits or wages. *See Tart v. Ill. Power Co.*, 366 F.3d 461, 474 (7th Cir. 2004) (noting that "title change and different reporting relationship" may be "largely semantic 'where the employee's salary, benefits, and level of responsibility would remain unchanged'" (citation omitted)). Curry arguably experienced only a lateral transfer to a different division under a different supervisor, with a chance to improve on some of the management problems that had been described in the OSLE report. As noted above, employees are ordinarily expected to remain employed while seeking redress for claims of discrimination; had Curry done so, we would be in a better position to evaluate the level of responsibility and quality of work that Curry was assigned in his new position. On balance, therefore, we conclude that Curry has failed to carry his burden of proving an adverse employment action.

B.      Similarly situated employees

Despite all of this, however, Curry insists that he did establish a prima facie case of discrimination on the basis of race. He asserts that it is "undisputed" that he met the first three requirements of the prima facie case—membership in a protected class, meeting legitimate expectations, and adverse employment action—and seeks to focus our attention on the issue of whether similarly situated employees who were not black were treated more favorably. *See McDonnell Douglas*, 411 U.S. at 802-03. Curry identifies three comparators: Frank Watts, the white Chief of Police at the VA Hospital in Brecksville, Ohio, who was not reassigned even after numerous allegations of serious police misconduct were found to be substantiated; Dr. Woods, the white Chief of Surgery at the Westside VA who retained his position even after a body of independent investigators uncovered "egregious violations of national standards"; and Dr. Nand, the Indian-American Chief of Behavioral Health Services at the Westside VA who was not removed from her position despite internal reports reflecting mismanagement in her service area. In addition, according to Curry, all three of these individuals were allowed to participate in the inspection process, though he

was not.  The VA counters, however, that Curry has not met any requirements of the prima facie case except showing membership in a protected class.

The district court did not address the elements of the prima face case, *see Coco v. Elmwood Care Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997). In this case, however, the question of similarly situated employees is easily resolved in favor of the VA.  Curry admitted that nearly all of his information about these three people was based on hearsay or double hearsay—information obtained through the "grapevine."  *See Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir. 2001) (noting that job applicant's personal belief carries no weight in summary judgment analysis).  Curry also admitted that he never saw any reports sustaining the allegations of mismanagement or wrongdoing against these other VA employees. Unlike Curry's situation, there is no evidence to show that a team of outside investigators recommended reassignment for any of three people he names. That is a critical factor in this case.  Finally, Curry was replaced in his position by another black man, which further weakens his argument that the VA eliminated him because of his race.  In sum, Curry did not present any admissible evidence that similarly situated employees outside of his protected class were treated more favorably.  *See Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 531-32 (7th Cir. 2003).

C.        Meeting employer's legitimate expectations and pretext

Ultimately, though, this case comes down to Curry's performance, which the district court chose to address as a question of pretext.  *See Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006) ("Normally a court should first determine if a plaintiff has established a prima facie case. . . .  However, if the plaintiffs argue that they have performed satisfactorily and the employer is lying about the business expectations required for the position, the second prong and the pretext question seemingly merge.").  Curry argues that he has produced sufficient evidence from which a reasonable jury could conclude that the VA's reason for reassigning him was pretextual.  He points to deposition evidence by Blakely, who is also black, who maintained that the entire investigation was "atypical" and "unfair" to Curry and offered her opinion that his reassignment "may" have been due to his race.  She identified as irregularities her lack of participation in the exit interview, Curry's inability to participate in the investigation, and the lack of time to respond to the investigators' findings.  Blakely also disagreed with the findings of mismanagement made against Curry in the OSLE report.

To constitute pretext, the VA's reason for reassigning Curry must be a lie.  *See Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 754 (7th Cir. 2006).  It does not matter whether an employer made the right decision, so long as its justification was an honest one.  *Id*.  "A pretext . . . is a deliberate falsehood."  *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th

Cir. 2006).  To prove pretext, a plaintiff must do more than establish that the employer's decision "was mistaken, ill considered or foolish," *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000), and instead the plaintiff must prove that the employer did not honestly believe the reason given for its action, *Hague*, 436 F.3d at 823.

Blakely's testimony and the inferences Curry draws from it are not sufficient to show that the VA's reason for his reassignment was pretextual and that its actual reason was discriminatory.  Blakely correctly labeled the OSLE procedures "atypical." An inspection by the Washington office with final oversight prompted by persistent complaints is unusual, to say the least. Curry questions the procedures the OSLE followed, but the OSLE's methods have no bearing on the honesty of the VA's belief that Curry ought to be reassigned.  And the wisdom of that reassignment is not before us.  *See Traylor v. Brown*, 295 F.3d 783, 790 (7th Cir. 2002) (explaining that this court does "not sit as a super-personnel department over employers scrutinizing and second-guessing every decision they make").  Curry's arguments regarding pretext do not rest on facts that genuinely call into question the honesty of the decision-maker; instead they imply a conspiracy to remove him from his position through the guise of a legitimate investigation into departmental misconduct.  We have previously said that we are "skeptical of such elaborate plot theories."  *See Murray v. Chi. Transit Auth.*, 252 F.3d 880, 888 (7th Cir. 2001) (quotation marks and citation omitted).  The uncontested fact that Curry's successor to his position was also black further belies his assertion that the VA was operating under a negative racial bias.

AFFIRMED.