NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued March 4, 2009
Decided June 29, 2009

**Before**

RICHARD D. CUDAHY, *Circuit Judge*

JOEL M. FLAUM, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

No. 07-3697

| | |
|---|---|
| ALAN TIMM,<br>    *Plaintiff-Appellant*, | Appeal from the United States District<br>Court for the Central District of Illinois. |
| *v.* | No. 05-C-1276 |
| ILLINOIS DEPARTMENT OF<br>CORRECTIONS,<br>    *Defendant-Appellee*. | Michael M. Mihm,<br>*Judge*. |

**O R D E R**

Alan Timm, a correctional sergeant at a women's prison, was fired by the Illinois Department of Corrections after an inmate who was left lying on her cell floor for several hours during a shift he supervised was pronounced dead from a brain hemorrhage the next day. In granting summary judgment the district court, applying the indirect method, concluded that the undisputed evidence established that Timm could not identify anyone similarly situated who was treated more favorably, and that the IDOC had a

legitimate—and unrebutted—nondiscriminatory reason for terminating him. Because Timm did not rebut any of the evidence put forward at summary judgment, we affirm.

## Background

The facts are construed in the light most favorable to Timm, *see Maclin v. SBC Ameritech*, 520 F.3d 781, 786 (7th Cir. 2008), and are, unless otherwise noted, uncontested. Timm worked at Dwight Correctional Center from 1991 until his termination in 2004. Dwight is a women's prison. As a correctional sergeant in the C-12 cottage, which houses about 100 inmates in disciplinary segregation, Timm was responsible for supervising the guards working in the cottage during his shifts.

On November 4, 2003, Kimberly Davis-Bills, a 41-year-old inmate held in the prison's C-12 cottage, began feeling dizzy after she returned from a disciplinary hearing. Officer Barbara Hoffmeyer, the correctional officer assigned that morning to Davis-Bills's wing, reported to Timm at about 10:30 a.m that Davis-Bills was feeling dizzy and wanted medication. Timm instructed Hoffmeyer to contact Nurse Janice Miller, communicate the nurse's instructions to Davis-Bills, and ensure that Davis-Bills followed those instructions. Miller recommended that Davis-Bills lie down and elevate her feet, which Hoffmeyer relayed to the inmate. The IDOC asserts that Timm told Hoffmeyer that Davis-Bills could not see the nurse, but that contention is disputed.

While walking the cottage sometime between 11:00 a.m. and noon Timm encountered Hoffmeyer, who told him that Davis-Bills was lying on the floor of her cell. Timm went to the cell and, looking through the door's small window, saw Davis-Bills lying "on the floor on her side like she had a seizure." According to Timm, he assumed that Davis-Bills "had a seizure, because that's usually what the inmates would do is if their cellmate had a seizure, the other one would roll them up on their side . . . and put a pillow underneath their head so they wouldn't hit their head." At that point Timm opened the window in the door to the cell and asked Davis-Bills if she was okay; Davis-Bills, waving her arm, responded, "Yeah." Timm also asked her cellmate if Davis-Bills was okay, and the cellmate responded that everything was fine. Timm told Davis-Bills to get up off the floor. He then left the cell and returned to the control panel at the center of the cottage to wait for the expected delivery of the inmates' lunch at noon.

By the time lunch arrived at 12:45 p.m., Timm had left the cottage for the prison's administration building to speak with an assistant warden about security concerns. After that meeting, which lasted about 20 minutes, Timm was contacted by another staff member in the shift commander's office who wanted to solicit union financial support (Timm was a union vice president) for the upcoming Christmas party. During that discussion Timm

received a phone call from Correctional Officer Sila, who said he was at Cottage C-12 to take some of the segregation inmates to the Health Care Unit. Sila wanted to take Davis-Bills but reported that she was lying on the floor and wasn't dressed or ready to go to the HCU. Timm, making his way back to Davis-Bills's cell, told Sila to "take somebody else."

When Davis-Bills did not respond to Timm's requests that she get off the floor, he entered her cell and was unable to find a pulse. Timm immediately went to the cottage's control panel to call Nurse Miller, but before he could make the call he saw several medical personnel (presumably called by Officer Sila) entering Davis-Bills's cell. Davis-Bills was then taken to the hospital. At 5:45 p.m. the next day, she succumbed to a brain hemorrhage caused by hypertensive cardiovascular disease and was pronounced dead.

An IDOC investigation into the death of Davis-Bills ensued. The investigator reported that Davis-Bills's cellmate, Christine Kazmirzak, observed a 35-year-old white male look into the cell sometime on the morning of November 4 and say to Davis-Bills, "Get up, or are you going to lay there all fucking day until the next shift comes." According to Kazmirzak, the same male officer returned to the cell, placed his foot on Davis-Bills, shook her, and told her, "Come on, you can get up." The investigator also reported that Hoffmeyer, during an interview, had said that Timm, when he first learned about Davis-Bills's condition, had replied that he "did not care that there was an inmate lying on the floor" and later, when told again that Davis-Bills was still on the floor, responded, "Fuck her." The IDOC investigator concluded that Timm, Hoffmeyer, and Ford (a guard who improperly kept the log book on November 4) had all "violated the Department Rule of Conduct of Individual regarding Negligence."

After the investigation had concluded, the IDOC conducted review hearings in January 2004 to determine the proper punishment for Timm, Hoffmeyer, and Ford. At the conclusion of those hearings, the review officer, Assistant Warden Ted Conkling, recommended that Timm be discharged. He summarized his findings as follows:

> The external investigation . . . clearly substantiates negligence and a failure to follow written guidelines. Sgt. Timm's failure to accurately report the incident is completely evident in the fact that his incident report dated November 4, 2003 . . . recorded only events beginning at 2:00 PM. Sgt. Timm did admit . . . involvement in relevant events beginning as early as 11:00 AM, on that date. Sgt. Timm additionally admitted . . . that the offender Davis-Bells [sic] . . . had suffered a seizure when he checked her at approximately 11:00 AM, yet he never contacted the Health Care Unit before medical staff arrived at 2:00 PM.

Accordingly, the Hearing Officer recommends Discharge due to the severity of the incident and the overall failure of Sgt. Alan Timm to complete his supervisory responsibilities. The review officer also recommended that Hoffmeyer be fired. He summarized his findings as follows:

> The external investigation . . . clearly substantiates negligence and a failure to follow written guidelines. Additionally, Officer Barbara Hoffmeyer's incident report dated November 4, 2003 . . . records events only beginning at 2:00 PM, however, during the investigation interview Officer Hoffmeyer admitted involvement in relevant events beginning as early as 11:00 AM on November 4, 2003. This hearing officer notes that Officer Barbara Hoffmeyer made several trips to C-12, Room C-1 to check on offender Davis-Bells [sic] . . . noticing little or no change in Offender Davis-Bells [sic] condition. Following the visits to Room C-1 Officer Hoffmeyer called nursing staff and advised her supervisor Sgt. Alan Timm. The problem existed that Offender Davis-Bells [sic] actions and conditions persisted with no further follow-up from Officer Hoffmeyer. Officer Hoffmeyer should have immediately sought out another supervisor other than Sgt. Alan Timm.

> Accordingly, the Hearing Officer recommends Discharge due to the severity of the incident.

Finally, the officer recommended that Ford receive a ten-day suspension. The IDOC ultimately accepted Conkling's recommendation for Timm, yet gave Hoffmeyer a 15-day suspension. In October 2004, pursuant to an agreed-upon resolution prior to arbitration, Hoffmeyer's punishment was reduced even further to a 10-day suspension and Ford's to one day. Timm, though, proceeded to arbitration, and his discharge was upheld. Who within the IDOC made the decisions to accept, reject, or modify Conkling's recommendations for these three employees is not disclosed in the record before us.

Timm then sued the IDOC under Title VII of the Civil Rights Act of 1964, *see* 42 U.S.C. §§ 2000e to 2000e-17, claiming that he was fired because of his gender. In response to the IDOC's motion for summary judgment, Timm first argued that he presented direct evidence of discrimination by testifying at his deposition that the hearing officer, Assistant Warden Conkling, had told him later that he was fired "because he was a male working in an all female institution." Timm also contended that his evidence that the IDOC had fired him but not Officer Hoffmeyer established a prima facie case of discrimination under the indirect, burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). During discovery, however, Timm had made no effort to learn the names of the IDOC officials who reviewed and acted on Conkling's recommendations, and thus he had

never confronted the actual decisionmakers about their reasons for retaining Hoffmeyer but not him.

The district court granted the IDOC's motion. With respect to the direct method, the court initially opined that, if Timm wanted to rely on an expression of discriminatory animus by Conkling or others, those statements would have to have been made "around the time of and in reference to" the incident. The statement reportedly made by Conkling, the court continued, was barred as inadmissible hearsay because Conkling had temporarily left his employment at the IDOC when he made the statement. And even if the statement was admissible, the court reasoned, it did not provide direct evidence of gender discrimination because Conkling had also recommended that Hoffmeyer be fired and was not involved in the IDOC's final decision regarding Hoffmeyer's punishment. Under the indirect method, the district court concluded that Timm and Hoffmeyer were not similarly situated because, the court reasoned, Hoffmeyer was "merely a correctional officer, while Sergeant Timm, a correctional sergeant, was in fact Officer Hoffmeyer's supervisor." And, the court continued, even assuming that Timm had made out a prima facie case of gender discrimination, he still could not prove pretext because he lacked evidence establishing that the IDOC "could not reasonably rely on [the investigative report] in making its decision to terminate his employment."

**Analysis**

On appeal Timm argues that, in rejecting his reliance on Assistant Warden Conking's statement as direct evidence, the district court imposed a "higher burden of proof" than is required. Timm contends that the court's comment regarding the need for an employee to show that the "decisionmaker expressed discriminatory feelings around the time of and in reference to" the adverse employment action constitutes an additional requirement not imposed by this court. Not so. The district court simply quoted a case from this court that elaborates on one category of circumstantial evidence. And even if the district court was mistaken, it did not use this "higher burden of proof" in finding that Timm's only direct evidence of discrimination constituted inadmissible hearsay because the hearing officer was no longer employed by the IDOC when he made the statement.

Timm also contends that the district court "ignored circumstantial evidence which would be probative of discrimination utilizing the direct proof method." But the evidence in question—the IDOC's disparate punishments—was offered as proof of gender discrimination under the indirect method. Thus, Timm did not raise this argument before the district court and it is waived. *See, e.g., Bus. Sys. Eng'g, Inc. v. Int'l Bus. Machs. Corp.*, 547 F.3d 882, 889 n.3 (7th Cir. 2008).

Finally, Timm renews his argument that he sufficiently established a prima facie case under *McDonnell Douglas*, and that he offered satisfactory evidence of pretext. We review a grant of summary judgment de novo, construing the facts and inferences in Timm's favor. *See Maclin*, 520 F.3d at 786. To establish a prima facie case of gender discrimination under the indirect method, a plaintiff must show that (1) he is a member of a protected class; (2) he was meeting his legitimate job expectations; (3) he suffered an adverse employment action; and (4) his employer treated similarly situated employees outside the class more favorably. *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 591-92 (7th Cir. 2008). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for its decision. *Germano v. Int'l Profit Ass'n, Inc.*, 544 F.3d 798, 807 (7th Cir. 2008). And if the defendant satisfies its burden, the burden shifts back to the plaintiff to show that the defendant's explanation was pretextual. *Bannon v. Univ. of Chi.*, 503 F.3d 623, 631 (7th Cir. 2007). Only the second and fourth prongs of Timm's prima facie case are disputed by the IDOC.[*]

Timm argues that he was similarly situated to Hoffmeyer because both had similar responsibilities, both operated under the same institutional standards, and both engaged in similar conduct on November 4, 2003. The IDOC responds that Timm, as Hoffmeyer's supervisor, cannot be similarly situated to Hoffmeyer. A similarly situated employee need not be "identical" to another employee, but is normally comparable in all material respects, such as dealing with the same supervisor, engaging in similar conduct, and being subject to the same standards. *See, e.g.*, *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008); *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). Yet we have "cautioned against a hyper-technical approach to this prong." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008). Our approach, instead, is a flexible one, looking for enough common features to allow for a meaningful comparison between substantially similar employees. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404-05 (7th Cir. 2007).

---

[*] Men who allege sex discrimination (a "reverse" discrimination suit) often are said to have a higher burden at the first prong because, historically, employers have not discriminated against them because they are male. *See, e.g.*, *Gore v. Ind. Univ.*, 416 F.3d 590, 592 (7th Cir. 2005). The circumstances in this case, however, show it to be no different than the typical discrimination case: the IDOC terminated Timm yet did not discharge an allegedly similarly situated female employee. And Timm worked in a women's prison at which gender is not a bona fide occupational qualification. We thus consider Timm's burden of proof on the first prong satisfied. *See Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 820-22 (7th Cir. 2006).

Here, the differences in job titles and supervisors is not dispositive.  Although Timm and Hoffmeyer did not deal with the same supervisor, *see Patterson*, 281 F.3d at 680, both were subject to the same institutional standards, a fact made clear by the hearing officer's recommendation.  In particular, the hearing officer noted that Ford, Timm, and Hoffmeyer all violated the "Department Rule of Conduct of Individual regarding Negligence."  *See, e.g.*, *Davis v. Wis. Dep't of Corrs.*, 445 F.3d 971, 979 (7th Cir. 2006) (holding that employees' violation of same work rule and placement in same violation category was sufficient for jury to find that all were similarly situated).  And the IDOC does not dispute that both Timm and Hoffmeyer were disciplined by the same decisionmaker, even if that person's identity remains undisclosed.  *See, e.g.*, *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004).  Most importantly, both employees were punished for the same transgression; they engaged in not just similar, but identical conduct—alleged negligence leading to Davis-Bills's death.  Thus, in terms of the prison's job standards and both employees' alleged misconduct, Timm and Hoffmeyer possessed a sufficiently similar "set of failings," *Lucas v. Pyramax Bank, FSB*, 539 F.3d 661, 667 (7th Cir. 2008), to allow for a meaningful comparison.

For the fourth prong, the IDOC argues that Timm was not meeting its legitimate expectations "in any sense."  But as the district court recognized (and as the IDOC seems to concede in its brief), where an employee was fired for a sudden and egregious breach of policy, we assume this prong has been met and move immediately to the pretext issue.  *See Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 742 (7th Cir. 2002); *Curry v. Menard, Inc.*, 270 F.3d 473, 477-78 (7th Cir. 2001).  Here, Timm does not contest that he acted negligently; rather, he claims that he was disciplined more harshly than Hoffmeyer after they engaged in like conduct in the very same incident.  It therefore makes little sense to analyze whether he was meeting the IDOC's legitimate expectations because if she was, then he was also, and vice-versa.

The case comes down to pretext.  The IDOC asserted that it "approved Timm's discharge due to 'the severity of the incident' and his failure to 'complete his supervisory responsibilities.'"  In particular, the hearing officer found that Timm had engaged in inexcusable negligent conduct by failing to report Davis-Bills's condition and therefore recommended that he be fired.  Where, as here, an employer offers a legitimate, nondiscriminatory reason for discharging an employee, the burden shifts back to the employee, who must show that the explanation is merely a pretext.  *Germano*, 544 F.3d at 807; *Bannon*, 503 F.3d at 631.  Timm argues that his termination is a pretext for gender discrimination because, although the hearing officer recommended that *both* he and Hoffmeyer be fired, Hoffmeyer was ultimately given only a ten-day suspension.  An employer's reason for a termination is pretextual if it is "not the ground" for its decision.

*Griffin v. Sisters of Saint Francis, Inc.*, 489 F.3d 838, 845 (7th Cir. 2007). The focus of the inquiry is whether the employer's explanation for the termination was honest. *See, e.g.*, *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008); *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006).

Here, Timm failed to counter the IDOC's asserted reason for his discharge with any evidence that would permit a jury to reasonably conclude that the stated reason is "not the true ground" for its decision. As the district court found, Timm did not present any evidence at summary judgment showing that the IDOC's explanation for his discharge was dishonest or that the IDOC really did not believe that his actions constituted inexcusable negligence. Nor did Timm ever make any effort to identify the actual decisionmaker. By failing to identify and depose those who on the one hand decided to send him to the arbitrator, but on the other hand decided to give Hoffmeyer a 10 day suspension, there is no recorded evidence of whether gender played a part in that split decision. Additionally, there is no evidence that the independent arbitrator who upheld Timm's discharge (thereby breaking any causal connection between the IDOC and Timm's termination) bore any discriminatory animus toward him. *See Jennings v. Ill. Dep't of Corrs.*, 496 F.3d 764, 767-69 (7th Cir. 2007). And since Hoffmeyer did not have to face the arbitrator, there was no decision that would have enabled the district court to compare the results.

Accordingly, we **AFFIRM** the district court's grant of summary judgment.